GALE COSTA *vs.* FALL RIVER HOUSING AUTHORITY & another.[1]

Bristol. December 2, 2008. - April 13, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Housing Authority. Municipal Corporations,* Housing authority. *Administrative Law,* Hearing, Regulations. *Due Process of Law,* Administrative hearing. *Evidence,* Hearsay.

This court concluded that applicable regulations of the Federal Department of Housing and Urban Development (HUD) allowed a public housing authority (authority) to terminate a recipient's (plaintiff's) participation in the Section 8 subsidy program for criminal activity beyond that which is violent or drug related, and, in particular, for criminal conduct that threatens the health, safety, or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises, specifically, engaging in sexual conduct for a fee and keeping a house of ill fame [620]; however, where the authority accomplished the termination by allowing the preliminary hearing officer who made the original termination decision to serve on the grievance panel reviewing the same decision [621-623], by improperly considering certain hearsay evidence that, although not categorically prohibited by the applicable regulations, was in this instance not sufficiently reliable to provide permissible evidentiary support for the authority's decision [623-629], and by failing to provide an adequate written explanation of the reasons for its decision [629-632], the termination of the plaintiff's subsidy violated the plaintiff's regulatory and constitutional right to due process of law, a violation that was not rendered moot by the plaintiff's subsequent plea of guilty to the criminal charges [632].

This court declined to express an opinion on a matter addressed by the Appeals Court but not briefed by either party on further appellate review. [632-633]

CIVIL ACTION commenced in the Southeast Division of the Housing Court Department on October 29, 2004.

The case was heard by *Anne Kenney Chaplin,* J., on motions for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

[1]The Attorney General, intervener.

*John Egan* for the defendant.

*Kenneth W. Salinger*, Assistant Attorney General, for the intervener.

*Deborah G. Roher* for the plaintiff.

The following submitted briefs for amici curiae:

*James M. McCreight* for Boston Tenants Coalition & others.

*David B. Gleich* for the Boston Housing Authority & others.

*Michael J. Sullivan*, United States Attorney, *Anita L. Johnson*, Assistant United States Attorney, *Barbara C. Biddle*, *John S. Koppel*, *Thomas W. Rodick*, & *David M. Reizes* for the United States.

*Richard M. Bluestein, Janet Steckel Lundberg, & Anthony J. Cichello* for Massachusetts Nonprofit Housing Association, Inc.

BOTSFORD, J. After Gale Costa was arrested and charged with engaging in sexual conduct for a fee, G. L. c. 272, § 53A, and keeping a house of ill fame, G. L. c. 272, § 24, the Fall River Housing Authority (FRHA) notified her it was terminating her participation in the Section 8 rent subsidy program.[2] Costa pursued and exhausted her administrative appeals, and thereafter brought an action pursuant to 42 U.S.C. § 1983 (2000) and G. L. c. 249, § 4, against the FRHA in the Housing Court, challenging the termination. Her complaint contained three counts. On cross motions for summary judgment, a judge in the Housing Court concluded that regulations promulgated by the United States Department of Housing and Urban Development (HUD) did not permit the FRHA to terminate a recipient's Section 8 rent subsidy benefits for "criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises," 24 C.F.R. § 982.551(l), and that the termination appeal hearing conducted by the FRHA, and its resulting decision, violated

[2] "The United States Department of Housing and Urban Development (HUD) Housing Choice Voucher Program, commonly referred to as 'Section 8,' provides rent subsidies 'so eligible families can afford decent, safe and sanitary housing.' . . . The program is 'generally administered by State or local governmental entities called public housing [authorities] (PHA). HUD provides housing assistance funds to the PHA. HUD also provides funds for PHA administration of the programs.' " *Carter* v. *Lynn Hous. Auth.*, 450 Mass. 626, 626-627 n.1 (2008) (*Carter*), quoting 24 C.F.R. § 982.1(a)(1) (2007).

Costa's regulatory and constitutional right to due process of law.[3] On the FRHA's appeal to the Appeals Court,[4] that court reversed the Housing Court judge's decision with respect to the meaning of HUD's regulations, but agreed that the termination appeal hearing and decision in this case violated Costa's procedural due process rights in several respects, including the fact that the grievance panel conducting the hearing based its decision to terminate solely on hearsay evidence. *Costa* v. *Fall River Hous. Auth.*, 71 Mass. App. Ct. 269 (2008) (*Costa*). We granted the FRHA's application for further appellate review.

We conclude that the applicable HUD regulations allow a public housing authority (PHA) such as the FRHA to terminate a recipient's participation in the Section 8 rent subsidy program for criminal activity beyond that which is violent or drug related, and in particular, for criminal conduct "that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises." 24 C.F.R. § 982.551(l). We also conclude that while a PHA such as the FRHA may permissibly base an appeal decision terminating Section 8 benefits on reliable hearsay evidence, in this case the grievance panel's decision failed to comply with applicable HUD regulations in several respects. We affirm the judgment of the

---

[3] In Costa's complaint, the claim concerning the scope and meaning of 24 C.F.R. § 982.551(l) was set out in the first count. The second count raised her due process claims concerning the termination appeal hearing and decision. The third count raised a claim under G. L. c. 249, § 4, which the trial judge dismissed as moot. No appeal has been taken from that count.

[4] It appears that while a clerk of the Housing Court issued a document entitled "judgment" on February 2, 2006, no "judgment" was entered on the docket in the Housing Court. Rather, the docket reflects a preliminary injunction order, dated January 26, 2005, enjoining Costa's termination from the Section 8 program; the memorandum of decision on the cross motions for summary judgment, dated February 2, 2006; and an order dated May 10, 2006, awarding Costa damages for emotional distress compensable under 42 U.S.C. § 1983 (2000), attorney's fees under 42 U.S.C. § 1988 (2000), and costs, all pursuant to a stipulation of the parties. The Appeals Court treated the summary judgment decision, (undocketed) "judgment," and the May 10, 2006, order as together disposing of the issues in the case and as "a comprehensive 'separate judgment' required by Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977)." *Costa* v. *Fall River Hous. Auth.*, 71 Mass. App. Ct. 269, 270 n.2 (2008) (*Costa*). We do so as well.

Housing Court in part, reverse in part, and remand the case for further proceedings consistent with this opinion.[5]

1. *Background.* Gale Costa is a participant in the Section 8 rent subsidy program administered by the FRHA pursuant to 42 U.S.C. § 1437f and implementing HUD regulations. In September, 2003, Costa rented a single-family home in Fall River, using a housing voucher issued by the FRHA to subsidize approximately eighty-five per cent of her rent.

On June 24, 2004, Costa was arrested by officers of the Fall River police department. The police report, prepared by Detective Jay Huard, related the following narrative. On June 23, 2004, investigating suspected prostitution activity, Huard made an appointment to go to Costa's house at 9:30 P.M. the following evening. He arrived at her house at the appointed time, supported by an anticipatory search warrant and several other detectives. Huard was met by Costa and another woman, Judy Kaeterle, both wearing lingerie. Costa asked if Huard had the money, and Huard asked how much it would cost. Costa replied, "Well it costs $75.00 for the dominatrix session and if you want sex with me it will cost you another $25.00. If you want sex with Judy and me it will be $150.00 total." Huard summoned the other detectives, arrested Costa and Kaeterle, and performed a search. Huard heard Costa state to Kaeterle, "I told you we should not have gotten into the sex thing. Charging money for the sex is what got us into trouble. DOM [charging for 'dominatrix' services] is not illegal. We should have stuck to that."

On July 12, 2004, the FRHA notified Costa that it planned to terminate her participation in the Section 8 program because she had violated the "[f]amily [o]bligation,"[6] set forth in 24

---

[5] We acknowledge the amicus briefs filed in support of the Fall River Housing Authority (FRHA) by the Massachusetts Nonprofit Housing Association, Inc.; the housing authorities of Boston, Acton, Cambridge, Hingham, Medford, Walpole, Watertown, Worcester, and Yarmouth; and the United States. We acknowledge the amicus brief filed in support of Costa by the Boston Tenants Coalition, City Life/Vida Urbana, and Massachusetts Coalition for the Homeless.

[6] A "[f]amily" is a "person or group of persons" approved to reside in a unit with Section 8 assistance. 24 C.F.R. § 982.4(b). Thus, references in the HUD regulations to a recipient "family" cover individual recipients such as Costa.

C.F.R. § 982.551, not to engage in "[c]rime by household members." An unsigned copy of Detective Huard's police report was attached to the notice. Costa exercised her right to appeal from the decision. On July 22, 2004, she was given an informal preliminary hearing — referred to in the FRHA grievance procedures as an "informal settlement conference" — before an FRHA hearings officer, Theresa Quental, who "affirmed" the FRHA's decision.

Costa then received a hearing before the FRHA grievance panel (grievance panel). Under the FRHA's grievance procedures, the appeal termination hearing to which a Section 8 recipient has a right under HUD regulations — referred to in those regulations as an "informal appeal hearing," see 24 C.F.R. § 982.555 — is conducted by the grievance panel, consisting of two FRHA employees, two tenants, and one person who is neither an FRHA employee nor a tenant. In Costa's case, one of the two FRHA employees on the grievance panel was Quental, the hearing officer who had conducted Costa's preliminary hearing. Costa, represented by counsel, appeared before the grievance panel on August 3, 2004. The grievance panel had before it materials including the unsigned copy of Detective Huard's June 24, 2004, police report; a letter from Costa's treating physician, indicating that she suffered from bipolar disorder, which could result in "risky behaviors"; and a local newspaper article dated July 8, 2004, two weeks after the arrest. The article, titled "Police Close House of Prostitution Taking Orders Online," quoted a police "spokesman," Detective Lieutenant John De-Mello. While substantially repeating the information contained in the police report, the article added the claims that "[p]olice have cracked a prostitution operation that a woman allegedly ran out of her home to clients who made appointments over the Internet," and that Huard's investigation was prompted by "information that Costa . . . was 'running a house of prostitution' at her home." The article was also, apparently, the only source of information before the grievance panel identifying the specific criminal charges against Costa.[7]

Costa testified at the grievance panel hearing. She stated that

[7]The article stated that Gale Costa was charged with "keeping a house of prostitution and offering sexual conduct for a fee."

she had agreed to meet Huard in order to engage in "fantasy play" as a "dominatrix" for money; that Huard had pressured her to participate in sex acts, but she had refused; but that Kaeterle had agreed to engage in sex with Huard. Costa also offered two letters from her nearest neighbors, indicating that she was a good and quiet neighbor, and a letter from a treating therapist, stating an opinion that her behavior was unlikely to repeat if her mania could be stabilized. At the conclusion of the hearing, the grievance panel orally advised Costa that it had voted unanimously to uphold the FRHA's termination decision.

The grievance panel provided Costa with written notice of its decision in a letter signed by Quental and dated August 31, 2004. Also on August 31, 2004, Costa pleaded guilty in the District Court to both criminal charges against her, and was sentenced to eighteen months' probation. Costa appealed from the grievance panel decision to the FRHA's board of commissioners, which reviewed her file and notified her on October 14, 2004, that it had found enough evidence to warrant termination from the program, effective November 1, 2004. There is no evidence that the board of commissioners knew of Costa's guilty pleas.

Costa filed the present action against the FRHA in the Housing Court, seeking to enjoin her termination from the Section 8 program and to recover compensatory damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988; she also sought certiorari review of the FRHA's termination decision pursuant to G. L. c. 249, § 4. The parties filed cross motions for summary judgment. After hearing, the Housing Court judge issued a decision allowing Costa's motion with respect to her claims brought under 42 U.S.C. § 1983, and dismissing her claim for certiorari review. The parties thereafter stipulated to damages in the amount of $1,950 for emotional distress, $11,000 for attorney's fees, and $235 for costs. The FRHA's appeal followed.

2. *Discussion.* (a) *Standard of review.* "An order granting or denying summary judgment will be upheld if the trial judge ruled on undisputed material facts and [her] ruling was correct as a matter of law." *Massachusetts Bay Transp. Auth.* v. *Somerville,* 451 Mass. 80, 84 (2008), quoting *Commonwealth* v. *One 1987 Mercury Cougar Auto.,* 413 Mass. 534, 536 (1992). Here,

the material facts are not in dispute. "We review questions of statutory interpretation de novo." *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006).

(b) *FRHA's regulatory authority.* The judge concluded that HUD regulations do not authorize a PHA such as the FRHA to terminate Section 8 assistance for criminal activity that is not drug related or violent.[8] She then ruled that because the criminal activity Costa was charged with having engaged in — soliciting sex for a fee (prostitution) and keeping a house of ill fame — was neither related to drugs nor violent, the FRHA could not terminate Costa's participation in the Section 8 program for such conduct. The Appeals Court disagreed. Based on its analysis of the three pertinent HUD regulations, 24 C.F.R. §§ 982.551(l), 982.552(c)(1)(i), and 982.553(b), the Appeals Court concluded that a PHA may permissibly terminate Section 8 rent subsidy benefits for all three categories of criminal activity mentioned in those regulations: violent criminal conduct, criminal conduct related to drugs, and also "other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises," 24 C.F.R. § 982.551(l), the latter of which could include the alleged criminal conduct at issue here. *Costa*, 71 Mass. App. Ct. at 275-278. For essentially the reasons stated by the Appeals Court, we agree.[9,10]

---

[8]As stated, Costa's claims are brought principally under 42 U.S.C. § 1983 (2000). It is "a complex and difficult question of [F]ederal law" whether "plaintiffs have an enforceable right under § 1983 not to have their Section 8 benefits improperly terminated in contravention of HUD regulations." *Gammons* v. *Massachusetts Dep't of Hous. & Community Dev.*, 523 F. Supp. 2d 76, 81, 82 (D. Mass. 2007). Because the FRHA and the Attorney General have not challenged or questioned Costa's right to seek relief under § 1983 in this case — their challenge is to the substantive merits of her claims — we consider any question about the issue to be waived and do not address it.

[9]The United States has filed in this court a brief as amicus curiae stating that the Appeals Court's interpretation of the applicable HUD regulations to authorize termination of Section 8 assistance for nonviolent and nondrug-related crime is consistent with HUD's own interpretation. The interpretation of its own regulations by a Federal agency such as HUD, set out in an amicus brief, is considered binding on a court, unless it is "plainly erroneous or inconsistent with the regulation[s]." *Press* v. *Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000), quoting *Auer* v. *Robbins*, 519 U.S. 452, 461-463 (1997). See *Rucker* v. *Lee Holding Co.*, 471 F.3d 6, 12 (1st Cir. 2006).

Costa argues that in 2001, HUD indicated an intent contrary to the one now

(c) *Procedural due process claims.* The judge determined that the FRHA's hearing process failed to provide Costa with the procedural due process required by both HUD regulations and the United States Constitution. In particular, the judge concluded that the FRHA failed to provide Costa with (1) an impartial decision maker; (2) an opportunity to confront and cross-examine each witness; and (3) an explanation of the reasons for its decision. See *Goldberg* v. *Kelly*, 397 U.S. 254, 266-271 (1970). See also *Clark* v. *Alexander*, 85 F.3d 146, 150 (4th Cir. 1996) (noting that HUD regulations governing Section 8 termination hearing process are designed to implement procedural protections described in *Goldberg* v. *Kelly, supra*). The FRHA challenges each of the judge's conclusions. We consider each separately.

(i) *Impartial decision maker.* The judge concluded that the FRHA failed to comply with HUD regulations, and denied Costa due process, when it permitted Theresa Quental to serve as the hearing officer for the "informal settlement conference" with Costa, and then as a member of the grievance panel.[11] The Appeals Court agreed. Without reaching the constitutional ques-

---

advanced in its amicus brief, in a response to public comment when HUD adopted the present version of 24 C.F.R. § 982.551(l). The comment and response, which deal with termination of tenancy rather than termination of assistance (see 66 Fed. Reg. 28,776, 28,783 [2001]), are not a clear enough indication of intent to overcome HUD's present explicit statement about the intended meaning of this regulation. We accept HUD's present statement.

[10]Costa raises an alternative argument that the Housing Court judge did not reach, and the Appeals Court discussed only as "guidance." See *Costa,* 71 Mass. App. Ct. at 278-279 n.8. She asserts that even assuming the cited regulation authorizes a participant's termination from the Section 8 program for conduct that threatens "the health, safety or right to peaceful enjoyment of the premises by other residents and persons residing in the immediate vicinity," Costa's particular alleged criminal conduct, even if proved, did not threaten anyone in her immediate neighborhood. The FRHA responds that the crimes Costa was charged with committing are per se threats to others living nearby. Like the Appeals Court, we also do not decide the issue, because, as we discuss in part 2 (c) (iii), *infra,* the grievance panel's written statement of reasons in this case is insufficient to permit meaningful review. In particular, it does not indicate on what basis the grievance panel itself decided that Costa's criminal activity violated 24 C.F.R. § 982.551(l).

[11]The Attorney General as intervener, argues, as to this and other of Costa's due process arguments, that they are waived because "[t]here is no indication in the record" that they were raised before the grievance panel. Costa's complaint states that she did ask Quental to recuse herself. The grievance

tion, we agree that under the applicable HUD regulation, Quental was not permitted to serve in both capacities.

As previously mentioned, when a PHA terminates a recipient's Section 8 assistance, the recipient has a right to an "informal hearing" before the termination takes effect. 24 C.F.R. § 982.555(a)(1)(v). See *Carter v. Lynn Hous. Auth.*, 450 Mass. 626, 633-634 (2008) (*Carter*). The HUD regulations go on to state that the informal hearing "may be conducted by any person or persons designated by the PHA, *other than a person who made or approved the decision under review or a subordinate of this person*" (emphasis added). 24 C.F.R. § 982.555(e)(4)(i).

The FRHA argues that Quental's participation in Costa's informal hearing as a member of the grievance panel did not violate 24 C.F.R. § 982.555(e)(4)(i), because "the decision under review" was not "made" or "approved" by her at the earlier informal settlement conference that she conducted. There is no claim that Quental "made" the decision to terminate Costa at the informal settlement conference; the issue is only whether she "approved" it. The language used in the FRHA's grievance procedures to describe that proceeding provides some support for the position that the role of the settlement conference is not to review and approve or disapprove the initial decision to terminate.[12] However, the letter informing Costa of the date for her informal settlement conference describes the conference as a "preliminary appeal hearing," at which the hearing officer (Quental) would evaluate any records or witnesses in Costa's favor and either "rule[] in favor of the participant" or "rule[] in favor of the

panel is not required to, and does not, produce a transcript or recording of the hearing, or issue a written decision stating subsidiary legal and evidentiary rulings. 49 Fed. Reg. 12,215, 12,230 (1984). We are wary of the proffered claim of waiver in these circumstances, where there is no "record" to support or refute the waiver claim. In any event, the issues raised in this case concerning procedural requirements applicable to Section 8 termination appeal hearings are significant for public housing authorities and Section 8 participants throughout the Commonwealth, and have been fully briefed by the parties and many amici curiae. See *Cottam v. CVS Pharmacy*, 436 Mass. 316, 320 (2002), and cases cited. We consider them on their merits.

[12]The grievance procedures state that the informal settlement conference is intended to "give the grievant the opportunity to discuss the grievance informally in an attempt to settle the grievance without the necessity of a grievance hearing. . . . If a grievance is not resolved at the informal conference, a grievance hearing shall be held."

[FRHA]." And in the affidavit submitted to the Housing Court in support of the FRHA's motion for summary judgment, an FRHA employee described Costa's settlement conference as "an informal hearing before Theresa Quental, Hearing Officer," at which Quental "affirmed the [FRHA's] decision."

Thus, by the FRHA's own descriptions of the informal settlement conference in this particular case, it seems clear that Quental was "approving" the FRHA's decision to terminate Costa; we see no meaningful distinction between "ruling in favor of" and "affirming" (the language used by the FRHA), on the one hand, and "approving" (the language of the HUD regulation) on the other. Accordingly, given her role as a person who "approved" the termination decision, we conclude that Quental's participation thereafter in the grievance panel violated 24 C.F.R. § 555(e)(4)(i).[13]

(ii) *Opportunity to cross-examine witnesses.* The judge ruled that the FRHA denied Costa the opportunity to cross-examine witnesses and violated her right to procedural due process by relying solely on hearsay in documents in reaching its decision. The Appeals Court agreed and perhaps went further; its opinion can be read to preclude the use of any hearsay evidence in termination appeal hearings. *Costa,* 71 Mass. App. Ct. at 281. The FRHA argues that it did not rely solely on hearsay, and that its procedure complied with the mandates both of HUD regulations and of due process. As discussed in the paragraphs that follow,

---

[13]To the extent that the FRHA argues that Quental's service on the grievance panel was harmless error because the other four members voted unanimously to terminate, we agree with the Appeals Court, see *Costa,* 71 Mass. App. Ct. at 282, that it cannot be presumed that the other members voted independently of Quental's influence, particularly where Quental had prior knowledge of the case from her role in the informal settlement conference, and authored the grievance panel's decision.

The issue whether one serving in an adjudicative capacity should properly participate in deciding a case that he or she earlier conferenced and sought to mediate or settle is the subject of a policy debate in other settings as well. See, e.g., Cratsley, Judicial Ethics and Judicial Settlement Practices: Time for Two Strangers to Meet, 21 Ohio St. J. on Dis. Res. 569 (2006) (proposing court rule to bar judge who tries to settle or mediate case before trial from thereafter trying that case if settlement efforts fail); Polster, The Trial Judge as Mediator: A Rejoinder to Judge Cratsley, 5 Mayhew-Hite Rep. on Dis. Res. & Cts. (2006-2007) (arguing that judge who tries to mediate case should be able to preside over at least jury trial of that case).

we conclude that (1) the FRHA's decision appeared to rest on hearsay evidence; (2) neither HUD regulations nor the due process clause bars the FRHA from basing its decision in whole or in part on hearsay evidence so long as the evidence is reliable; and (3) some of the hearsay on which the grievance panel rested its decision in this case was not sufficiently reliable to provide permissible evidentiary support for that decision.

The FRHA first argues that the judge inaccurately characterized the grievance panel as relying exclusively on the police report and newspaper article, inasmuch as the grievance panel also had before it Costa's testimony, which, it contends, corroborated many details. While it is true that Costa testified that she agreed to provide "dominatrix" services in exchange for a fee,[14] she did not corroborate any of the essential facts supporting the grievance panel's conclusion that she herself committed "criminal activity." In particular, the allegations that Costa agreed to trade sex for money and engaged in prostitution, and had been charged with criminal offenses, are found only in the police report and newspaper article. Therefore, if the panel's determination is to be sustained, it must be on the basis of those two exhibits alone.

The next question is whether HUD's regulations permit or preclude the use of hearsay evidence. Hearing procedures are governed by 24 C.F.R. § 982.555(e), and the issue of evidence is addressed specifically in § 982.555(e)(5), which states: "The PHA and the family must be given the opportunity to present evidence, and may question any witnesses. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings." We can discern nothing in § 982.555(e)(5) that precludes or even addresses the use of hearsay evidence; the clear import of the regulation's first sentence is that the PHA and the recipient have a right to "question" only those persons who actually appear and testify as "witnesses."[15] Moreover, we read the regulation's specific reference to the inapplicability of formal rules of evidence as support

---

[14]The FRHA does not contend that "dominatrix" services, alone, are illegal or constitute "criminal activity."

[15]In this case, it appears the only live witness was Costa. Costa states in her brief that an employee of the FRHA read aloud the police report that was

for the conclusion that there is no categorical prohibition of hearsay.

Moving beyond the HUD regulation, the judge ruled that the FRHA's "exclusive reliance on hearsay violated [Costa's constitutional] due process rights because it deprived her of her right to cross-examine the witnesses upon whom [it] relied in making [its] decision to terminate her assistance." The judge's conclusion ultimately rested on her reading of *Goldberg* v. *Kelly*, 397 U.S. 254, 270 (1970). However, we do not read the *Goldberg* decision as a strict bar on hearsay evidence; as we have said in another context, "the due process clause does not place a per se prohibition on the use of hearsay evidence." *Commonwealth* v. *Durling*, 407 Mass. 108, 115 (1990) (*Durling*). "Unlike the confrontation clause, due process demands that evidence be reliable in substance, not that its reliability be evaluated in 'a particular manner.' [*Crawford* v. *Washington*, 541 U.S. 36, 61 (2004).] That the focus on reliability may not accommodate a simple, predictable, bright-line rule does not alter the fact that reliability, not cross-examination, is the 'due process touchstone.' " *Commonwealth* v. *Given*, 441 Mass. 741, 747 n.9 (2004), quoting *Durling*, *supra* at 117 (discussing use of hearsay evidence in sexually dangerous person commitment proceeding).[16]

A determination of procedural due process requirements in a particular context calls for the balancing of (1) the private interest affected by the official action; (2) "the risk of an erroneous

---

submitted to the grievance panel, but it does not appear that this reader was considered to be a witness.

[16]In *Commonwealth* v. *Durling*, 407 Mass. 108 (1990) (*Durling*), we upheld a probation revocation based solely on two police reports. While the probationer was entitled to due process protections in connection with the revocation proceeding, *id.* at 112-113, including a "right to confront and cross-examine adverse witnesses," *id.* at 113, quoting *Gagnon* v. *Scarpelli*, 411 U.S. 778, 786 (1973), we held that due process is a "flexible concept," *Durling*, *supra* at 113, that the "touchstone" of due process requirements is to provide in the context "an accurate and reliable determination" whether revocation is proper, *id.* at 117, and the due process clause does not prohibit the use of hearsay evidence where there is "a showing that the proffered evidence bears substantial indicia of reliability and is substantially trustworthy." *Id.* at 118. But we also cautioned that "when hearsay is offered as the only evidence of the alleged violation, the indicia of reliability must be substantial . . . because the probationer's interest in cross-examining the actual source (and hence testing its reliability) is greater when the hearsay is the only evidence offered." *Id.*

deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the governmental interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Duarte* v. *Commissioner of Revenue*, 451 Mass. 399, 412 (2008), quoting *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

With respect to the private interest at stake, the right to public housing assistance is "of great personal importance," but not "fundamental," deriving from "no deeper source than the State's undertaking to provide it." *Spence* v. *Gormley*, 387 Mass. 258, 275 (1982). As for the risk of error arising from reliance on hearsay, the risk will vary widely with the nature of the hearsay. Reliance on hearsay that is anonymous, uncorroborated, or contradicted by other evidence will create particular risk of error. See *Merisme* v. *Board of Appeals on Motor Vehicle Liab. Policies & Bonds*, 27 Mass. App. Ct. 470, 475 (1989). See also *Kurdi* v. *DuPage County Hous. Auth.*, 161 Ill. App. 3d 988, 993-994 (1987). On the other hand, reliance on hearsay from known, disinterested parties that is factually detailed, is given under penalty of law, or fits a recognized hearsay exception, will be relatively unlikely to result in error. See *Durling*, 407 Mass. at 121; *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 530 (1988). See also *Richardson* v. *Perales*, 402 U.S. 389, 402-403 (1971).

Finally, we consider the several public interests involved. The public has an interest in the enforcement, on a timely basis, of the "[f]amily [o]bligations" of Section 8 participants, which cover both threats to the public fisc and threats to public safety, see, e.g., 24 C.F.R. § 982.551(b), (d), (h), (k), (l), (m). Cf. *Durling, supra* at 115-116 (need to protect public from recidivist probationer). Particularly where both HUD and the FRHA lack the authority to subpoena witnesses, 55 Fed. Reg. 28,538, 28,541 (1990), a requirement that the FRHA proceed only with live testimony would often substantially delay or prevent enforcement. The public also has an interest in affordable administration of the Section 8 program, which, we are told, cannot serve anywhere near the number of persons who seek to participate.[17] A require-

---

[17]According to the amicus brief of the Massachusetts Nonprofit Housing

ment of live testimony and cross-examination could substantially raise the cost of administration. See *Mathews* v. *Eldridge*, 424 U.S. at 348; *Durling, supra* at 116 ("the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed"). On the other hand, additional procedure may bring a "benefit . . . to society in terms of increased assurance that the action is just," *Mathews* v. *Eldridge, supra,* a consideration that potentially weighs in favor of excluding hearsay evidence.

Balancing these factors leads to the conclusion that consistent with applicable due process requirements, hearsay evidence may form the basis of a PHA's decision to terminate Section 8 assistance so long as that evidence contains substantial indicia of reliability.[18] See *Gammons* v. *Massachusetts Dep't of Hous. & Community Dev.*, 502 F. Supp. 2d 161, 165-166, *S.C.*, 523 F. Supp. 2d 76, 85 (D. Mass. 2007) (dismissing due process challenge to Section 8 assistance termination decision based in part on hearsay statements of landlord). See also *Beauchamp* v. *de Abadia*, 779 F.2d 773, 775-776 (1st Cir. 1985) ("The principle that hearsay evidence is admissible in administrative proceedings would be vitiated if a party could object to its admission on the ground that he was denied his [due process] right to cross-examination").

The question remains whether the hearsay evidence introduced at the grievance panel hearing was sufficiently reliable to serve as the basis for the panel's termination decision. As to the police report of Detective Huard, we conclude that it was. The police report offered a detailed factual account based on the personal observations of the detective, and it is a crime for a police officer to file a false report. G. L. c. 268, § 6A. See *Durling*, 407 Mass. at 120-121.[19] Cf. *Kurdi* v. *DuPage County*

---

Association, Inc., the length of time on waiting lists for Section 8 vouchers in the Commonwealth currently ranges from two to five years.

[18]In reaching this conclusion, we decline to follow *Edgecomb* v. *Housing Auth. of Vernon*, 824 F. Supp. 312, 316 (D. Conn. 1993), a case relied on by the judge and the Appeals Court that concluded hearsay evidence could not form the basis of a termination decision. The *Edgecomb* decision dealt with anonymous, second-level hearsay, having no indicia of reliability, and the court did not apply the balancing test set out in *Mathews* v. *Eldridge*, 424 U.S. 319 (1976).

[19]Costa argues that the police report introduced at the grievance panel hear-

*Hous. Auth.*, 161 Ill. App. 3d at 993-994 (hearsay statements of anonymous persons who "believed" information stated was not reliable and could not be basis of decision). Cf. also *Basco* v. *Machin*, 514 F.3d 1177, 1182-1183 (11th Cir. 2008) (questioning admissibility and use of police report based on second-level hearsay at Section 8 termination hearing).

The newspaper article is a different matter. Much of the article clearly derives from the police report, and is cumulative even if it were properly admitted. However, the article persistently states that Costa had made an ongoing practice of offering sex for money at her home, a suggestion that relies on information supplied by an unidentified source and is not specifically stated in the police report. Thus, the article states that "[police spokesman] DeMello said Detective Jay Huard got information that Costa lived at the address and was 'running a house of prostitution' at her home" — a statement representing several levels of hearsay, with the final level anonymous.[20] The grievance panel could not properly base a decision to terminate assistance on this kind of unattributed, multi-level, and conclusory hearsay evidence. Contrast *Commonwealth* v. *Nunez*, 446 Mass. 54, 56, 57, 59 (2006) (at probation revocation hearing, named robbery victim's hearsay statement to police officer describing robbery incident and perpetrator sufficiently reliable where it was factually detailed, based on personal knowledge and direct observation, and made soon after events at issue).

The consequence of the improper consideration of the newspaper article turns on the weight the grievance panel might

ing was not signed, a factor, she suggests, that helps demonstrate its unreliability. It does not appear that Costa made this argument before the Housing Court; it is therefore waived. See *Matter of the Trusts Under the Will of Crabtree*, 449 Mass. 128, 152-153 (2007). In any event, the absence of a signature would not seem to affect materially the reliability of the report, particularly where Costa would have had the ability to obtain, for comparison purposes, a copy of the report actually on file at the police department following her arrest, and also had the ability to present evidence challenging the report's accuracy — which she did, through her testimony.

[20]As further examples, the article was titled, "Police close house of prostitution taking orders online," and began, "Police have cracked a prostitution operation that a woman allegedly ran out of her home to clients who made appointments over the Internet." There was no mention of use of the Internet to "run" a prostitution ring in the police report.

have placed on it as reflected in its decision. We therefore turn to the decision.

(iii) *Explanation of reasons for decision.* Under 24 C.F.R. § 982.555(e)(6), the grievance panel, as the entity that conducted the hearing, was required to "issue a written decision, stating briefly the reasons for the decision."[21] As the words of the regulation make clear, the written decision must "reflect factual determinations relating to the individual circumstances of the family (based on a preponderance of the evidence at the hearing)." *Carter*, 450 Mass. at 636. See *Wojcik* v. *Lynn Hous. Auth.*, 66 Mass. App. Ct. 103, 110-112 (2006) ("the hearing officer must hear evidence and find facts relating to 'all relevant circumstances' "). See also *Clark* v. *Alexander*, 85 F.3d 146, 150 (4th Cir. 1996) (HUD regulations, designed to implement protections in *Goldberg* v. *Kelly*, 391 U.S. 254 [1970], require, inter alia, decision based on evidence, stating reasons for decision).

The grievance panel's decision stated the following:

> "After careful consideration of all presented at the hearing, the Grievance Panel voted unanimously in favor of the [FRHA] to terminate your [Section 8] subsidy.
>
> "This determination is based on the following: the preponderance of evidence of criminal activity that includes — police report from the Fall River Police Department dated June 24, 2004 of your arrest and a newspaper article from the Fall River Herald News dated July 8, 2004."

The second quoted paragraph clearly represents the panel's statement of reasons, but the statement does not readily translate into the findings or "[f]actual determinations" required by § 982.555(e)(6); it simply lists the evidentiary sources on which the grievance panel relied. The first difficulty presented by this approach is that we cannot determine if the panel based its

---

[21]Title 24 C.F.R. § 982.555(e)(6) provides: "(e) Hearing procedures . . . (6) Issuance of decision. The person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing. A copy of the hearing decision shall be furnished promptly to the family."

termination decision solely on the information in the police report concerning Costa's offer to engage in sex for a fee on June 24, 2004, and the reported results of the search made by the police of Costa's house; or whether it relied in whole or in part on the statement in the newspaper report that Costa was running "a prostitution operation" out of the rented premises — a statement that implies an established, ongoing enterprise. For reasons we have previously discussed, the former would be based on reliable evidence, but the latter would not.

The second difficulty concerns the grievance panel's statement that it based its decision on "the preponderance of evidence of criminal activity." A determination that a recipient has engaged in generic criminal activity by itself is not a sufficient reason for termination of assistance under the HUD regulations. Rather, the panel was obligated by 24 C.F.R. § 982.555(e)(6), to state, at least in brief form, its factual findings concerning the specific criminal activity Costa had engaged in, and then to indicate whether it found that such conduct "threaten[ed] the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises." 24 C.F.R. § 982.551(l).[22]

There is a third difficulty with the panel's decision that in a sense underlies the second. As HUD states in its amicus brief, HUD regulations give PHAs discretion to determine which particular types of criminal activities within the three broad categories delineated in § 982.551(l) create cause for termination of assistance. See, e.g., 24 C.F.R. §§ 982.552(c)(1)(i), 982.553(b). See also 61 Fed. Reg. 47,380, 47,380 (1996) (impossible to define "criminal activity that threatens," because "it turns on the facts in every given situation").[23] The regulations also vest discretion

[22]As discussed in part 2 (b), *supra*, a PHA may terminate Section 8 assistance under 24 C.F.R. § 982.552(c)(1)(i), on account of three different types of criminal activity: (1) drug-related; (2) violent; and (3) nonviolent criminal activity "that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises." 24 C.F.R. § 982.551(l). There is no dispute that only the third category is applicable in this case.

[23]See generally 42 U.S.C. § 1437(a)(1)(C) (2000) ("It is the policy of the United States . . . to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration . . .").

in PHAs to decide whether, in a particular case, even though the criminal conduct or activity at issue may "threaten" and may be serious enough to warrant termination, there are mitigating facts that point in the other direction. See 24 C.F.R. § 982.552(c)(2)(i).[24] See also *Carter*, 450 Mass. at 636; *Wojcik* v. *Lynn Hous. Auth.*, 66 Mass. App. Ct. at 111-112. As we have indicated (see note 10, *supra*), we do not reach here the question whether prostitution is a type of criminal conduct that, as the FRHA suggests, constitutes a per se threat to the "health, safety or right to peaceful enjoyment" of others living in the immediate vicinity, within the scope of § 982.551(l). However, we do not doubt that the FRHA or any PHA could exercise its discretion to make such a determination, at least in some circumstances. Cf. *Lowell Hous. Auth.* v. *Melendez*, 449 Mass. 34, 39-40 & n.3 (2007), quoting *Boston Hous. Auth.* v. *Bryant*, 44 Mass. App. Ct. 776, 780 (1998) (under G. L. c. 121B, § 32, tenants in State's public housing projects subject to peremptory eviction without prior hearing when engaging in violent or "visibly asocial" criminal activities, including use of rental premises for prostitution). The significant point is that the grievance panel has discretion, both in determining the types of nonviolent crimes that might pose the requisite "threat" to the immediate neighborhood, and in determining whether in a particular case, all the individual circumstances, considered together, warrant termination. We are not able to ascertain from its decision whether the grievance panel was aware of its discretion in these areas.[25] See *Carter, supra* at 636-637.

Clearly, the hearing on termination of Section 8 assistance

[24]Title 24 C.F.R. § 982.552(c)(2) provides in relevant part: "(c) Authority to deny admission or terminate assistance. . . . (2) Consideration of circumstances. In determining whether to deny or terminate assistance because of action or failure to act by members of the family: (i) The PHA may consider all relevant circumstances such as the seriousness of the case . . . [and] mitigating circumstances related to the disability of a family member . . . ."

[25]Costa briefly mentions in her brief that the grievance panel failed to indicate whether it chose to exercise its discretion under 24 C.F.R. § 982.552(c)(2)(i) to limit its sanction in light of Costa's disability related to her bipolar disorder. See 24 C.F.R. § 982.552(c)(2)(iv). See also *Carter*, 450 Mass. at 638. Cf. *Boston Hous. Auth.* v. *Bridgewaters*, 452 Mass. 833 (2009) (obligation of PHA to consider reasonable accommodation for disabled public housing tenant who, because of disability, poses threat to health or safety of other tenants). This issue has not been sufficiently argued by Costa or addressed by the other parties to enable us to review it here.

can be, and is intended to be, informal, and the procedural require-
ments applicable to it are designed to be flexible. Nevertheless,
"[r]egardless of the statutory or regulatory scheme, and regard-
less whether the hearing is [formal] or informal, no reviewing
court can determine whether a hearing officer has fulfilled his
statutory or regulatory obligations in the absence of an adequate
record." *Id.* at 636-637 n.16. See *Cole* v. *Metropolitan Council
HRA*, 686 N.W.2d 334, 338 (Minn. Ct. App. 2004) ("the over-
arching concern of the appellate court is that the record be suf-
ficient to facilitate meaningful review"). The grievance panel's
decision is not adequate for us to perform the necessary review-
ing function in the present case.[26]

(d) *Guilty pleas and attorney's fees.* We noted at the outset
that some weeks after her hearing before the grievance panel,
Costa pleaded guilty to the two criminal charges against her. We
agree with the Appeals Court that these guilty pleas do not
render moot Costa's claims of procedural unfairness in this case
because, among other reasons, guilty pleas are not conclusive of
the underlying facts, but evidence of them. See *Costa*, 71 Mass.
App. Ct. at 282-283 & nn. 10-12.[27]

Also noted previously was the fact that in the Housing Court,
Costa was awarded, in amounts stipulated by the parties, dam-
ages pursuant to 42 U.S.C. § 1983 for emotional distress as
well as attorney's fees and costs under 42 U.S.C. § 1988. The
Appeals Court concluded that because the Housing Court judge
had erred in accepting Costa's claim that HUD regulations do
not permit termination of Section 8 assistance for criminal
activity unless it qualified as violent or related to drugs, Costa

[26]In its amicus brief, the United States asserts that the FRHA's hearing and
the grievance panel's decision complied with HUD regulations as well as due
process requirements. We do not view an argument by HUD that a particular
hearing and decision of a PHA satisfy a HUD regulation to carry the same
presumptive weight as an argument by HUD concerning the proper interpreta-
tion of its regulations. See note 9, *supra.*

[27]We also agree with the Appeals Court that in any further Section 8 termina-
tion proceedings that the FRHA may pursue in connection with Costa's June
24, 2004, arrest and its consequences, Costa would be permitted to introduce
evidence in explanation for her guilty pleas. See *Costa*, 71 Mass. App. Ct. at
283. In any event, as we have discussed in part 2 (c) (iii), the FRHA would
still need to consider whether in this case "all relevant circumstances," 24
C.F.R. § 982.552(c)(2)(i), warrant termination.

could not qualify as a "prevailing party" with respect to this particular claim (set forth in the first count of Costa's complaint) for purposes of the award of attorney's fees under 42 U.S.C. § 1988, and there must be a recalculation of the attorney's fee award. *Costa,* 71 Mass. App. Ct. at 284. Neither the FRHA nor the Attorney General addresses in the briefs before us the question of damages or of attorney's fees and costs. Costa also does not argue the issue, although she does ask this court to "make an appropriate order for plaintiff's attorney's fees for work performed in the trial court." In these circumstances, we express no opinion on the question whether the award of attorney's fees to Costa, who remains the prevailing party, should be recalculated; we leave this question for the Housing Court to consider on remand.[28]

3. *Conclusion.* For the reasons stated in this opinion, the judgment of the Housing Court is affirmed with respect to the second count of Costa's complaint, and reversed with respect to the first count of the complaint. The matter is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

---

[28]With respect to Costa's request for reasonable appellate attorney's fees and costs connected to FRHA's appeal to this court, she may apply to the court in accordance with the procedure set forth in *Fabre* v. *Walton,* 441 Mass. 9, 10-11 (2004). With respect to any request for attorney's fees and costs that Costa may have incurred opposing FRHA's direct appeal to the Appeals Court, Costa may apply to that court for such fees and costs. See *T & D Video, Inc.* v. *Revere,* 450 Mass. 107, 117 (2007).