Greco, PJ.
The defendant, Tracey Fontes (“Fontes”), has appealed the judgment entered against her in the Chelsea District Court that awarded possession to the Chelsea Housing Authority (“Authority”) of the apartment she was renting from the Authority. In its notice to quit, the Authority notified Fontes that the eviction it would seek in this action was based, among other things, on her failure to report addition *8 al income for the years 2006,2007, and 2008, to provide completed income tax forms or a W-2, and to comply with a payment agreement she had signed. The notice indicated that Fontes owed the Authority “the total of $6907.22 for unreported income.” As both a defense, see G.L.c. 239, §2A and a counterclaim, see G.L.c. 186, §14, Fontes claimed that the eviction was in retaliation for her complaining to the local board of health about mice in her apartment. She also filed counterclaims alleging breaches of the warranties of habitability and quiet enjoyment.
The case was tried before a jury. Before the testimony began, the Authority’s motion to dismiss the retaliation claim was denied. The trial judge also ruled that the claims related to habitability and quiet enjoyment would be considered as counterclaims, but not defenses. After the Authority presented its evidence and rested, Fontes did not move for a directed verdict. At the close of all the evidence, however, Fontes moved for a directed verdict on so much of the complaint as alleged a failure to comply with a payment agreement. The motion was allowed. Fontes also moved for a directed verdict “with respect to [the Authority’s] claim of failure to report a change of ten percent or more [of income] in a given month” on the grounds that the lease and relevant regulations do not provide that such a failure could be the basis of an eviction, and that even if it were, the specific provisions here were too vague to be enforced. The trial judge denied that motion for a directed verdict, stating that the “jury will have to decide that issue.”
The trial judge submitted the case to the jury by way of special questions. The jury found that Fontes “committed a serious or repeated violation of the lease”; that the Authority did not waive that violation; and that Fontes “engaged in a protected activity when she complained to the ... [Authority] about mice in [her] apartment,” but that the Authority did not seek to terminate her lease within six months of her complaint. The jury concluded that judgment was to enter for the Authority for possession, but did not assess any money damages. As to Fontes’ counterclaims, the jury found in favor of the Authority on both the breach of quiet enjoyment and breach of the warranty of habitability claims.
The sole issue raised by Fontes on this appeal is “[w]hether the income reporting requirements” in the Chelsea Housing Authority’s lease “are unconstitutionally vague as applied to a failure to report an increase of 10% or more in the average weekly wage for any month compared to the average used to calculate the rent.” The Authority argues that those provisions are not vague; that, in any event, Fontes did not preserve that issue on appeal; and that the findings of the jury were not clearly erroneous.
To put the reporting requirements in context, Fontes leased an apartment from the Authority on November 21, 2002. Based on her income, her rent was set at $230.00 per month. The lease provided that she was required annually to provide “accurate information about her income” so that the Authority would be able to determine whether her “rent should be changed.” Whatever rent was determined would remain in effect until the next yearly redetermination, “except that the rent shall be changed where a change of household composition or other circumstances results in a change of income of 10% or more.” Fontes was required to “report any change in ... income of 10% or more within (30) thirty days of its occurrence.” If, as *9 a result of such a report, her rent were changed, the increase would be “effective” on the first day of the following month. This requirement also appeared in the section of the lease entitled ‘TENANT OBLIGATIONS.” It was further provided that the Authority may terminate the lease for “[failure to notify [the Authority] of... an increase of 10% or more in family income in accordance with” the above provision.
At trial, there was evidence that in 2006, Fontes failed to report an increase in income of 10.9% in July, 17% in August, 24.9% in September, and 31.2% in October. As to 2007, there was evidence that she failed to report increases of 20% in April, 49% in July, 37% in August, and 31% in September. In 2008, she failed to report receiving sick and vacation pay that would have amounted to a 57% increase. However, on February 7, 2008, Fontes promptly notified the Authority that she was out of work, which prompted the Authority to reduce her rent to $0 for the months of February through October, 2008. Subsequently, Fontes agreed to a payment plan whereby she would pay the Authority amounts necessary to make up the difference between what she did pay in monthly rent and what she should have been paying based on her income. However, she did not follow through on that agreement. At trial, Fontes testified that her “understanding” was that the 10% reporting requirement applied only “[i]f I get another job, if I get a raise.” Yet when asked whether she knew why she had signed an income authorization form, she answered, “I believe it was a change in income or a change in jobs, they varied.” Finally, on redirect examination by her lawyer, the following exchange took place:
Q. Okay. And as far as your lease goes, you were required to notify the housing manager when there had been a change, correct?
A Yes.
Q. You weren’t required to give them documentation or a letter were you?
A No.
Q. But you notified them within 30 days because you knew it was a change of more than ten percent.
A Yes.
Q. And that’s what your lease says to do?
A Yes.
1. Procedural Issue. As noted, Fontes did not move for a directed verdict after the close of the Authority’s case. After the conclusion of all the evidence, contrary to the Authority’s position, Fontes did move for a directed verdict with respect to the very issue she raises on this appeal. That motion was denied, with the court noting that the vagueness issue was a question of fact “for the jury to decide.” The Authority correctly notes that Fontes did not file a motion for judgment notwithstanding the verdict pursuant to Mass. R. Civ. E, Rule 50(b). However, Fontes has preserved her right to test the sufficiency of the evidence on this appeal. See Tucker v. Badoian, 376 Mass. 907, 916 (1978); Hatton v. Meade, 23 Mass. App. Ct. 356, 361 (1987).
2. Procedural Due Process. Fontes argues that the Authority violated her right to procedural due process by basing her eviction on provisions in the lease that were *10 vague. “A determination of procedural due process requirements in a particular context calls for the balancing of (1) the private interest affected by the official action; (2) ‘the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards’; and (3) the governmental interest, ‘including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.’” Costa v. Fall River Hous. Auth., 453 Mass. 614, 625-626 (2009), quoting Matthews v. Eldridge, 424 U.S. 319, 335 (1976).[1] As stated in Caswell v. Licensing Comm’n for Brockton, 387 Mass. 864 (1983), a “law is void for vagueness if persons ‘of common intelligence must necessarily guess at its meaning and differ as to its application.’ Vague laws violate due process because individuals do not receive fair notice of the conduct proscribed by a statute, and because vague laws that do not limit the exercise of discretion by officials engender the possibility of arbitrary and discriminatory enforcement” (citations omitted). Id. at 873. However, where a law does not relate to First Amendment rights or criminal conduct, “a less stringent vagueness standard applies.” Id.
Applying the factors noted in Costa above, we conclude that there is no question that Fontes has a very strong private interest in her access to public housing. On the other hand, the Authority has a significant governmental interest in its ability to provide housing, which can be negatively impacted if tenants do not pay their fair share while other people remain on its waiting list. With respect to procedural safeguards, in some respects the 10% rule is not a model of clarity, and it would not be burdensome for the Authority to remedy that, for example, by explaining in the lease or elsewhere how the rule would apply to hypothetical situations, particularly as to any obligation to average weekly pay checks. In the circumstances of this case, however, any possible vagueness did not appear to be a major issue. In her testimony, Fontes appeared to understand her obligations. Moreover, she repeatedly idled to notify the Authority of increases, most of which were well over the 10% level. A person of “common intelligence” — and there was nothing to indicate that Fontes was not such a person — would in these circumstances readily understand that she was frequently earning a greater amount of money.[2] Yet she did nothing, thereby violating her obligations under the lease. All she was required to do was report an increase. It would then have been up to the Authority to determine what, if any, action would be taken. This reporting requirement could theoreticdly dlow the Authority to monitor changes in income and to determine whether they are temporary and short lived so as possibly to not justify a rent recalculation, or whether they are significant and more frequent. If the increases were minor or infrequent, the rent presumably would not significantly increase. A person of “common intelligence” *11 would also have understood that the rule was not limited to situations where the tenant obtained a new job or received a raise or promotion.[3] This was public housing. Rent was assessed based on income. Income was the issue, not how Fontes made it. Accordingly, in the particular circumstances of this case, we rule that the verdict of the jury was supported by the evidence.
Judgment affirmed.
So ordered.

 At issue in Costa was whether HUD regulations authorized a housing authority “to terminate Section 8 assistance for crimind activity that is not drug related or violent.” Id. at 620.

 On occasions when Fontes did submit pay stubs, she left out some in the sequence that would have driven up her increases even further, thereby permitting the inference that she understood the system quite well.

 The dissent suggests that the rent should be recalculated only where “a tenant has a change of income of a more permanent nature, such as a new job, promotion, raise in salary, or ongoing increase in hours assigned.” However, under such criteria, one whose rent was initially based, for example, on his working twenty hours a week at $8.00 an hour (or $160.00 a week), and whose hours sporadically increased over time to thirty hours a week, thus raising his income to $240.00 a week, might stay under the radar screen and avoid any recalculation. On the other hand, his next door neighbor who is working thirty hours a week at $8.00 an hour (or $240.00 a week), but then gets a $2.00 an hour raise, thus increasing his weekly income to $300.00, would certainly face a recalculation. The dissent is also concerned that a tenant may forget his or her base income at the tíme of the last certification. A tenant would, however, have a strong incentive to remember that dollar amount or keep a record of it in the event his income decreased so as to qualify him for a reduction of his rent.