# Illinois Official Reports

## Appellate Court

---

**Porter v. Illinois State Board of Education, 2014 IL App (1st) 122891**

---

| | |
|---|---|
| Appellate Court Caption | KECIA PORTER, Plaintiff-Appellant, v. THE ILLINOIS STATE BOARD OF EDUCATION, STACEY STUTZMAN, as Hearing Officer for the Illinois State Board of Education, and BARBARA BYRD-BENNETT, as Superintendent for City of Chicago School District 299, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-12-2891 |
| Filed | February 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action challenging the decision of the Illinois State Board of Education with regard to the special education accommodations made for the learning disabilities suffered by plaintiff's daughter, including the rejection of plaintiff's request for private placement in a therapeutic day school at public expense, was confirmed by the appellate court, since the decision was not clearly erroneous. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-36463; the Hon. Peter Flynn, Judge, presiding. |
| Judgment | Confirmed. |

Counsel on
Appeal

Kecia Porter, of Chicago, appellant *pro se*.

James L. Bebly and Lee Ann Lowder, both of Chicago Board of
Education Law Department, of Chicago, for appellees.

Panel

PRESIDING JUSTICE CONNORS delivered the judgment of the
court, with opinion.
Justices Cunningham and Delort concurred in the judgment and
opinion.

**OPINION**

¶ 1     Plaintiff sought administrative review of an adverse decision of the Illinois State Board of Education regarding accommodations made for her daughter's learning disability. On appeal, she argues that the circuit court applied the wrong law in determining whether her daughter received an appropriate education, that it abused its discretion in finding that plaintiff's due process rights were not violated, and that the court made prejudicial comments about her during the proceedings. She also contends that the underlying administrative decision was arbitrary. For the following reasons, we confirm the administrative decision.

¶ 2                                    BACKGROUND

¶ 3     Plaintiff Kecia Porter challenges the special education accommodations provided to her daughter, K.P., who is an elementary school student in Chicago Public School District 299 (District). In 2008, K.P. was initially evaluated by the District and deemed eligible for an individualized education plan (IEP) at her school to accommodate her learning disabilities. In May of 2010, Porter commissioned a private psychological evaluation from a psychologist at the University of Illinois at Chicago (UIC) because she believed that the District terminated services it was providing K.P. without properly assessing whether those services were still warranted. Pursuant to that evaluation, K.P. received a diagnosis of "Attention Deficit/Hyperactivity Disorder–Combined Type" (ADHD) in addition to reading, math, and verbal learning disabilities. Among other things, the examiner recommended one-on-one tutoring, the use of assistive technology, and the provision of extra time to take tests.

¶ 4     Porter filed a request for an impartial due process hearing with the Illinois State Board of Education (Board) pursuant to section 14-8.02a of the Illinois School Code (Code) (105 ILCS 5/14-8.02a (West 2010)) seeking to include the UIC examiner's recommendations in K.P.'s existing IEP. The District issued a modified IEP in February of 2011. Porter and District

- 2 -

representatives then met to review that IEP. According to the District, Porter and the District discussed each of Porter's concerns. However, Porter ultimately rejected all of the proposed changes on the IEP and stated that she intended to have K.P. placed in a private therapeutic day school at public expense. In the meantime, K.P. was transferred to a different school within the District. She also began private tutoring using the Wilson Reading System, a multisensory reading instruction system.

¶ 5     On April 7, 2011, Porter again sought an impartial due process hearing, which is the subject of this appeal. In this application, she alleged more than a dozen reasons for challenging the IEP, including that it: failed to provide assistive technology services, failed to provide appropriate modifications and accommodations, failed to identify strategies that will be used to achieve goals, failed to identify all of K.P.'s disabilities, failed to state whether K.P. was eligible for services beyond the District's normal school year, and failed to provide private speech and tutoring services. She sought a revision of K.P.'s IEP and placement in a private school at public cost. Defendant Stacey Stutzman was assigned as the Board's hearing officer.

¶ 6     About a month later, the District then issued another modified IEP. It included recommendations for K.P.'s use of assistive technology and extended school year services over the summer. The report also indicated that under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. § 1400 *et seq.* (2006)), K.P. should be educated in the same classroom as her nondisabled peers unless there is some reason to justify receiving services in a separate setting. The IEP team considered several alternative placements for K.P. with varying degrees of interaction with nondisabled students. It considered whether K.P. could attend regular classes full time with supplementary aides and services, but that was deemed insufficient to meet her academic needs. It also considered whether K.P. could spend less than 20% of her school week in a separate class to receive special services, but as a result of a previous due process hearing, that option was deemed inappropriate. It ultimately concluded that K.P. would be best served by attending regular classes and spending 25% of her time, or 430 minutes per week, receiving services in a separate class.

¶ 7     Porter did not seek to add multisensory instruction to K.P.'s IEP at this time. She sought more one-on-one instruction and expressed her belief that K.P. would benefit from placement in a therapeutic day school, the most restrictive type of learning environment aside from a residential placement.

¶ 8     Porter and the District then participated in a prehearing conference related to her due process hearing request. Stutzman prepared a prehearing conference report identifying the sole issue in dispute as "Whether [the] District has failed to place [K.P.] in the least restrictive environment in which she can receive a satisfactory education, which [Porter] contends is a separate school offering multisensory instruction for students with learning disabilities." Stutzman's report specifically noted that "[Porter] assured [Stutzman] and District counsel that this is the only issue she wishes heard" and that private placement was the only remedy sought. The District responded that because K.P. made academic gains in her current least restrictive environment, placement in a therapeutic day school was not appropriate.

¶ 9     The due process hearing was held in June of 2011 before Stutzman. Porter appeared *pro se*. She called Debra Gawrys to testify. Gawrys owns Connections Learning Center

(Connections), which specializes in tutoring and remediation services for children with learning disabilities. K.P. began private tutoring at Connections in February of 2011. Gawrys evaluated K.P. and determined that she should participate in the Wilson Reading System, which Gawrys described as a 12-step, structured, multisensory approach to teaching reading. Gawrys testified that K.P. has benefitted from the small group setting as well as the Wilson program itself.

¶ 10    Gawrys testified that the goals and accommodations contained in the May 2011 IEP did not adequately address K.P.'s learning disability, specifically, her dyslexia. She stated that the IEP focused on K.P.'s reading comprehension, but Gawrys believed that K.P.'s issues involved her ability to read. Gawrys also testified that K.P.'s difficulty with math was also related to her dyslexia. She stated that K.P. is two grade levels behind in reading and math, but that if K.P. finished the Wilson program, she would be able to read at grade level. She also stated that a normal classroom setting is not helpful for K.P. because it is not possible to provide the accommodations and modifications contained in the IEP in a large classroom setting.

¶ 11    Porter then testified by offering a narrative explanation of the documents she submitted. She testified that the May 2011 IEP contained many "contradictions" regarding K.P.'s abilities and the stated goals. Stutzman noted that Porter had not "made any of that an issue in this case. [Porter] made it very clear that the issue for [Stutzman] to decide was where [K.P.] should be placed." Porter also read from a letter she received from UIC that she received about two weeks before the hearing, which stated that the "Wilson Reading System would be an effective method for teaching [K.P.] to read. *** Their intensive instruction in small group settings seems well-fitted to address K.P.'s presenting learning deficits."

¶ 12    Stutzman also asked Porter whether K.P. was taking any medication for her ADHD symptoms. Porter testified that K.P. took medication for two months, but had not been taking any medication in the past six months.

¶ 13    On cross-examination, Porter admitted that the multisensory learning program, specifically the Wilson program, was not addressed in the May 2011 IEP. She also admitted that she did not provide the District with any documentation about the Wilson program or K.P.'s tutoring with Gawrys before the IEP meeting. However, she stated that she discussed the Wilson program with K.P.'s teachers. She also did not present UIC's letter to the District before the hearing.

¶ 14    The District called K.P.'s special education teacher, Claire Blouin, to testify. She testified at length about the different methods used to teach K.P. She also discussed K.P.'s test scores. She indicated that K.P. has improved in math, but she still maintained a deficit in her reading ability. Blouin testified that she believed K.P. could benefit from multisensory instruction, including the Wilson method.

¶ 15    The District also called Ethel Barker to testify. As the special projects manager for the District, Barker manages multisensory instruction programs. She stated that the District provided multisensory instruction and the Wilson method at a different District school, to which K.P. could be transferred. She also stated that K.P.'s current special education teachers could be trained in the Wilson method and administer that program to her at her current school. She testified that the multisensory instruction program would be conducted in a separate

classroom from her general education courses. She would be in a class with up to eight other students.

¶ 16    Stutzman then issued a written decision. She determined that the therapeutic day school was not the least restrictive environment in which K.P. could receive a satisfactory education. She based her decision on federal cases with similar factual scenarios that interpreted IDEA provisions. Under federal law, when determining whether a student was educated with her peers "to the maximum extent appropriate," the court must decide whether the education offered "in the conventional school [was] satisfactory, and, if not, whether reasonable measures would have made it so." She cited a recent decision, which held that if a student could receive a satisfactory education in a public school placement, while spending 30% of his school day with typical peers, then placement in a private therapeutic day school was inappropriate because it was not the least restrictive environment. See *James D. v. Board of Education of Aptakisic-Tripp Community Consolidated School District No. 102*, 642 F. Supp. 2d 804 (N.D. Ill. 2009). Accordingly, she determined that the District was not required by law to offer K.P. a more restrictive learning environment, such as a therapeutic day school, if a less restrictive option was available to allow implementation of K.P.'s IEP.

¶ 17    Stutzman further concluded that although Porter did not seek multisensory instruction at the May 2011 IEP meeting, the District offered to transfer K.P. to a school that had such instruction available or train the teachers at her current school to administer the Wilson program. She noted that Porter's witness, Gawrys, testified that K.P. could complete the Wilson program within a year, which would bring her up to grade level in her language skills. Therefore, she concluded that a private placement in a therapeutic day school was not appropriate.

¶ 18    Porter filed a petition for a writ of *certiorari* in the circuit court seeking review of Stutzman's decision. The court denied the petition "for the reasons stated in open court." However, the record does not contain a transcript of the proceedings in the circuit court.

¶ 19    Porter then filed this appeal. Porter argues that the circuit court erred in failing to apply the applicable law, it abused its discretion in determining that Porter's due process rights were not violated, and it made prejudicial comments about her. She further contends that Stutzman's order was arbitrary.

¶ 20                                    ANALYSIS

¶ 21                              A. Standard of Review

¶ 22    The District[1] first indicates that the standard of review in this case is unclear. It analyzes this case under both a manifest weight of the evidence standard and a clearly erroneous standard.

¶ 23    We begin by examining the procedural posture of this case. This case is before us on appeal from a common law writ of *certiorari*, which is used to obtain circuit court review of an administrative decision when the administrative agency's enabling statute does not expressly

---

[1]The Attorney General did not file an appellee's brief on behalf of the Board.

adopt the Administrative Review Law (the Review Law) (735 ILCS 5/3-101 *et seq.* (West 2010)) and provides no other method for reviewing the agency's decisions. *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 332-33 (2009); *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). The Review Law was intended to replace writs for *mandamus*, *certiorari*, and other equitable, statutory, and common law actions as methods of review and provide uniformity in reviewing administrative decisions. *Outcom*, 233 Ill. 2d at 333. However, the Review Law does not apply unless it has been expressly adopted. *Id.*

¶ 24  Our review of the Code reveals that the decision of an impartial hearing officer under article XIV is not expressly reviewable under the Review Law. Article XIV does provide a means of review of the hearing officer's decision; specifically, that any party dissatisfied by that decision has "the right to commence a civil action with respect to the issues presented in the impartial due process hearing" "in any court of competent jurisdiction" within 120 days after the hearing officer's decision is mailed. 105 ILCS 5/14-8.02a(i) (West 2010). However, because the Review Law was not specifically adopted in article XIV, proceeding under a writ of *certiorari* was appropriate here. See *Outcom*, 233 Ill. 2d at 332-33.

¶ 25  Our review of a writ of *certiorari* is "essentially the same" as our review of a petition filed under the Review Law. *Id.* at 337. The purpose of *certiorari* review is to have the entire record of the inferior tribunal brought before the court to determine, from the record alone, whether that body proceeded according to the applicable law. *Reichert v. Court of Claims*, 203 Ill. 2d 257, 260 (2003) (citing *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 427 (1990)). Accordingly, we review the administrative agency's decision, not the circuit court's decision. *Outcom*, 233 Ill. 2d at 337 (holding that review of a common law writ is treated as "any other appeal that comes to us on administrative review"). Moreover, our traditional standards of review of administrative decisions apply under these circumstances. *Id.*

¶ 26  The applicable standard of review in each case depends on the question posed on appeal. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). Here, Stutzman's decision contained two conclusions based on the preponderance of the evidence: (1) that the District did not predetermine K.P.'s school placement in contravention of the statute's procedural guarantees; and (2) that K.P.'s placement in a therapeutic day school at public expense was not warranted because the District could provide a free appropriate public education (FAPE) in a less restrictive environment.[2]

¶ 27  Porter complains that Stutzman ignored certain facts in arriving at her conclusions, which presents a mixed question of fact and law. A mixed question of fact and law is one "in which

---

[2]The language of Stutzman's order tracks the legal framework used by the federal courts when reviewing administrative decisions brought under section 1415 of the IDEA, which is "essentially identical" to section 14-8.02a of the Code. *Community High School District 155 v. Denz*, 124 Ill. App. 3d 129, 134 (1984); see also 20 U.S.C. § 1415(i)(2) (2006). The United States Supreme Court has interpreted section 1415 as requiring the court on administrative review to ensure that: (1) the school district has complied with the procedures set forth in the IDEA, and (2) the IEP is reasonably calculated to enable the child to receive educational benefits. *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-07 (1982).

the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." (Internal quotation marks omitted.) *Cinkus*, 228 Ill. 2d at 211. We apply a clearly erroneous standard of review to mixed questions of fact and law. *Id.* An administrative agency's decision "is deemed clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id*. We examine each of Stutzman's conclusions in turn.

¶ 28                                    B. Procedural Compliance

¶ 29        The IDEA guarantees disabled children the right to a FAPE, which is implemented through the provisions of article XIV of the Code. *In re D.D.*, 212 Ill. 2d 410, 419-20 (2004). While section 1415 of the IDEA is well litigated, Porter's claim was brought solely under section 14-8.02a of the Code, which has not been addressed by this court. *Cf. Jenna R.P. v. City of Chicago School District No. 229*, 2013 IL App (1st) 112247 (analyzing claim for public funding of private placement under section 1415). A FAPE is one that is "specially designed to meet the unique needs of the [disabled] child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89. This goal is achieved through assessment of the student's educational needs and an IEP based on that assessment. *In re D.D.*, 212 Ill. 2d at 420-21; 105 ILCS 5/14-8.02 (West 2010).

¶ 30        Section 14-8.02 sets forth a detailed process for identifying, evaluating, and placing disabled students in the appropriate learning environment. 105 ILCS 5/14-8.02 (West 2010). It requires school district personnel to prepare a comprehensive evaluation of the student to determine whether he or she is eligible for special education services. 105 ILCS 5/14-8.02(b) (West 2010). After the student is deemed eligible for services, an IEP meeting is held to develop his or her individualized education program. 105 ILCS 5/14-8.02(b) (West 2010). Under section 14-1.02 of the Code, the IEP must be written and agreed upon "by appropriate school personnel and parents or their representatives for any child receiving special education." 105 ILCS 5/14-1.02 (West 2010); see also *In re D.D.*, 212 Ill. 2d at 420 (quoting prior version of the statute).

¶ 31        Nevertheless, an impartial due process hearing may be convened at the request of the student's parent or the school district to challenge the "actual or proposed placement, identification, services, or evaluation of the student." 105 ILCS 5/14-8.02a(f)(3) (West 2010). Section 14-8.02a sets forth in detail the procedure for due process hearings. The parent and school district must first participate in a resolution meeting or mediation for the purpose of resolving the problem raised in the hearing request. 105 ILCS 5/14-8.02a(g-20), (g-25) (West 2010). If no agreement is reached, the hearing officer convenes a prehearing conference to clarify the matters each party "believes to be in dispute in the case and the specific relief being sought," and generally to facilitate the eventual hearing. 105 ILCS 5/14-8.02a(g-40) (West 2010).

¶ 32        Porter argued that the District predetermined K.P.'s placement in a District school before the IEP meeting occurred. Under the IDEA and Article XIV of the Code, the District must

"ensure that a continuum of alternative placements is available" to meet disabled students' needs, including an evaluation of regular classes, special classes, special schools, home instruction, and institutionalized instruction. 23 Ill. Adm. Code 226.240 (2007); 23 Ill. Adm. Code 226.300 (2012); 34 C.F.R. § 300.115(a), (b) (2007). The ultimate placement decision must be based on the IEP and cannot be made before the IEP is produced; to do otherwise is an impermissible predetermination. 23 Ill. Adm. Code 226.240 (2007); 34 C.F.R. § 300.116(b) (2007). See also *Board of Education of Township High School District No. 211 v. Ross*, 486 F.3d 267, 274 (7th Cir. 2007) (discussing the federal courts' interpretation of section 1414 of the IDEA).

¶ 33    Porter argued that she requested the due process hearing on April 7, 2011, to challenge K.P.'s then-existing IEP. She asserted that the IEP was inappropriate for a number of reasons and described the relief sought as "private placement at public cost." On April 18, the District issued its written response to her claims. It stated that because K.P. has made academic gains in her current placement, which it believed to be the least restrictive environment, "it is the District's position that a private placement is not appropriate." The meeting to review the IEP did not occur until May 10, 2011. Porter contends that because the District "rejected" private placement before the IEP meeting occurred, it "predetermined" K.P.'s placement without knowledge of her needs.

¶ 34    Stutzman concluded that the mere fact that the District's statement preceded the IEP meeting in time does not compel the conclusion that it "predetermined" K.P.'s placement. Rather, the statement was the District's response to Porter's claim that K.P. was entitled to a private placement. The District was required to respond to Porter's assertion and its position was that K.P.'s then-current placement was appropriate. Thus, it was not rendering the ultimate "placement determination" in providing its response. See 23 Ill. Adm. Code 226.240 (2007); 34 C.F.R. § 300.116(b) (2007). The IEP meeting was later convened because it became apparent that there was an unresolved dispute about the appropriate accommodations and placement for K.P. 105 ILCS 5/14-8.02a(g-20), (g-25) (West 2010). Furthermore, the IEP itself reflects that the District considered other placement options for K.P. See 23 Ill. Adm. Code 226.240 (2007); 23 Ill. Adm. Code 226.300 (2012); 34 C.F.R. § 300.115(a), (b) (2007).

¶ 35    We cannot say that Stutzman's conclusion was clearly erroneous. The Code provides an elaborate set of procedures to ensure that a parent has an active and meaningful role in the development and modification of her child's IEP. See 105 ILCS 5/14-8.02 (West 2010). In addition to Stutzman's findings, the record reflects that Porter has been very active in participating in the IEP process and has affected significant change on her daughter's behalf. Most notably, her efforts have encouraged the District to provide K.P. with multisensory instruction that she might not have otherwise gotten. Thus, we are not left with a definite and firm conviction that Porter was denied the procedural guarantees conferred by the Code. See *Cinkus*, 228 Ill. 2d at 211.

¶ 36                                    C. Substantive Compliance

¶ 37    Porter also contends that Stutzman failed to consider certain facts in concluding that K.P. was not entitled to placement in a private therapeutic day school. She argues that Stutzman's

decision "is solely based on the fact that the [D]istrict could implement [multisensory] instruction for [K.P.] but gave no consideration to [K.P.'s] disabilities and the continued lack of academic progress causing a 2-3 year deficits [*sic*] in reading and math or the interruption of services."

¶ 38        The IDEA requires that a FAPE for students with disabilities includes "special education and related services that '(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program.' " *In re D.D.*, 212 Ill. 2d at 420 (quoting 20 U.S.C. § 1401(8) (2000)). Section 14-8.03 of the Code provides a framework for implementing the specific IEP designed for a disabled student. That is, the school district shall "consider and develop 'the transition goals and supports for eligible students with disabilities' at the IEP meeting and provide services as identified in the student's [IEP]." *Id.* at 420-21 (quoting 105 ILCS 5/14-8.03(a) (West 1998)).

¶ 39        The District must also educate the student in the "least restrictive environment," meaning that "[t]o the maximum extent appropriate, the placement shall provide the [student] with the opportunity to be educated with children who are not disabled." 105 ILCS 5/14-8.02(d) (West 2010); see also *Rowley*, 458 U.S. at 202; *In re D.D.*, 212 Ill. 2d at 421. Placement in alternative settings "shall occur only when the nature of the severity of the disability is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 105 ILCS 5/14-8.02(d) (West 2010). In such circumstances, "[w]hen the student's resident school district is unable to meet a student's disability needs, the student is eligible to receive educational services elsewhere." *In re D.D.*, 212 Ill. 2d at 421 (citing 105 ILCS 5/14-7.01 (West 1998)). The resident school district may then be obligated to reimburse the private institution for the cost of that private education, as such private educational services " 'shall be at no cost to the parent or guardian of the child.' " *Id.* at 421-22 (quoting 105 ILCS 5/14-7.02 (West 1998)). Thus, our supreme court has concluded that "if a student's resident school district is unable to meet [a student's] needs, *only then* is the student eligible to receive resident school district reimbursed educational services elsewhere." (Emphasis in original.) *Id.* at 426.

¶ 40        Stutzman concluded that there was no evidence presented that K.P. required placement in a therapeutic day school, which all agreed was a more restrictive setting. She concluded that K.P. "can receive a satisfactory education" at a District school while also having "contact with her typical peers during the school day."

¶ 41        Stutzman relied on a federal case involving a nearly identical claim. Under similar circumstances, the federal district court determined that if a student could receive a satisfactory education in a public school placement while spending 30% of his school day with typical peers, and the other 70% of his time in special education classes, then placement in a private therapeutic day school was inappropriate because it would not be the least restrictive environment. See *James D.*, 642 F. Supp. 2d at 813, 823-24. In this case, K.P. could receive an appropriate education by spending 75% of her time with her typical peers and 25% of her time in special education classes. Thus, in keeping with the least restrictive environment

requirement, her IEP could be implemented in the general education classroom, with additional resources, related services, and accommodations and modifications. The District was not required to offer her a more restrictive placement in a therapeutic day school when this less restrictive option was available to meet her academic needs. In fact, the District was prohibited from doing so. See *In re D.D.*, 212 Ill. 2d at 426; 105 ILCS 5/14-8.02(d) (West 2010).

¶ 42 Additionally, Porter's claim that Stutzman "gave no consideration to [K.P.'s] disabilities and the continued lack of academic progress causing a 2-3 year deficits [*sic*]" is belied by the record. In her decision, Stutzman cited to the testimony of Porter's own witness, Gawrys, who stated that K.P. could complete the Wilson multisensory instruction program within a year, which would bring her up to grade level in her language skills. The District offered to place K.P. in a school that already provided such instruction or train the teachers at her current school to administer the program. Thus, Stutzman's decision was well reasoned and grounded in fact and was not clearly erroneous.

¶ 43                                    D. Remaining Claims

¶ 44 Porter's remaining arguments involve errors she claims were committed by the circuit court. As to her substantive claim that the court applied the wrong law in denying her petition for a writ of *certiorari*, we review the decision of the administrative agency and not the circuit court (*Outcom*, 233 Ill. 2d at 337) and we have addressed the merits of Porter's claim at length above.

¶ 45 Porter also contends that the circuit court erred in ruling that her due process rights were not violated and that the court made "prejudicial and inflammatory" comments about her. However, the record contains no transcript of the hearing at which the court allegedly made these rulings or inflammatory comments. It is an appellant's burden to present this court with the materials necessary to review her claims of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In the absence of those materials, we must presume that the circuit court's actions were appropriate. *Id.* at 392. We resolve any doubts that arise from the incompleteness of the record against the appellant. *Id.* Accordingly, there is no basis for concluding that the circuit court erred.

¶ 46                                       CONCLUSION

¶ 47 For the foregoing reasons, the decision of the administrative agency is confirmed. The hearing officer's decisions regarding K.P.'s placement, and Porter's participation in the process of determining that placement, were not clearly erroneous. The insufficiency of the record on appeal prevents us from reviewing Porter's remaining claims.

¶ 48 Confirmed.