# Illinois Official Reports

## Appellate Court

---

**_Miles v. Housing Authority_, 2015 IL App (1st) 141292**

---

| | |
|---|---|
| Appellate Court Caption | TONETTA MILES, Petitioner-Appellee, v. HOUSING AUTHORITY OF COOK COUNTY, Respondent-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-1292 |
| Filed | August 13, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CH-13695; the Hon. Rita M. Novak, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael E. Kujawa and Deborah A. Ostvig, both of Judge James & Kujawa LLC, of Park Ridge, for appellant.<br><br>Matthew Hulstein, of Chicago Volunteer Legal Services, of Chicago, for appellee. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices Howse and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent, the Housing Authority of Cook County (HACC), appeals from the trial court's decision to reverse HACC's termination of petitioner Tonetta Miles's housing voucher, which provided her with rent assistance. At an informal hearing, HACC determined that Tonetta violated the rules of the voucher program because a member of her household, her son Lanord Miles, had committed "violent criminal activity."

¶ 2    The trial court reversed that decision, among other reasons, because HACC presented only hearsay statements that contained insufficient facts regarding Lanord's alleged crimes. On appeal, HACC contends that the trial court erred in concluding that HACC's decision was against the manifest weight of the evidence.

¶ 3    We agree with the trial court. We find the record insufficient to sustain HACC's decision because of significant shortcomings in the record, and because, even if we accepted the hearsay evidence, that evidence did not support a finding that a member of Tonetta's household engaged in violent criminal activity. HACC's decision to terminate her voucher was against the manifest weight of the evidence. We affirm the trial court's judgment reversing HACC's decision to terminate Tonetta's voucher.[1]

¶ 4                              I. BACKGROUND

¶ 5    The United States Department of Housing and Urban Development (HUD) runs the housing choice voucher (HCV) program, wherein HUD provides funds for rent assistance for low-income individuals. 24 C.F.R. § 982.1(a) (2013). Local public housing authorities, like HACC, administer the program pursuant to HUD regulations. See 24 C.F.R. §§ 982.51-982.54 (2013). One of those regulations required that HACC establish and abide by an Administrative Plan to regulate its operation of the program. 24 C.F.R. § 982.54 (2013). Under HACC's Administrative Plan in effect at the time of this case, HACC stated that it "will terminate a family's assistance" if a household member engaged in "drug-related or violent criminal activity during participation in the HCV program." Housing Authority of the County of Cook, *Housing Choice Voucher Program Administrative Plan* § 12-I.E., at 218 (2012), http://thehacc.org/wp-content/uploads/2012/09/2012-Housing-Choice-Voucher-Administrative-Plan.pdf (hereinafter HACC Administrative Plan). The Administrative Plan defined "violent criminal activity" as "any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage." *Id.*; see also 24 C.F.R. § 5.100 (2012) (defining "violent criminal activity" in the same way).

¶ 6    On August 24, 2012, Tonetta was authorized to participate in the HCV program by HACC. She signed a document acknowledging her obligations under the HCV program. Tonetta received a voucher from HACC for her residence at 1315 McDaniel Avenue in Evanston, Illinois.

---

[1]In light of our disposition, we do not reach the other issues Tonetta raised in her brief: that the hearing officer erred in treating termination as a mandatory, rather than discretionary, sanction, and that the hearing denied her of due process.

¶ 7    On February 22, 2013, HACC sent Tonetta a letter indicating that it planned to terminate her benefits. The letter indicated that HACC had "received information from the Evanston Police Department that [Tonetta's] family members and [her] unit ha[d] been involved in violent criminal activity." Specifically, HACC stated that "Lanord Miles was arrested for possession of cannabis four (4) times between 2009-2012, for battery in 2010 and for aggr[a]vated battery and aggr[a]vated discharged of a firearm in 2013." In response to the letter, Tonetta requested an informal hearing regarding the termination of her voucher. See 24 C.F.R. § 982.555(a)(1)(v) (2013) (requiring local housing authorities to provide informal hearings on termination of vouchers when requested by program participant).

¶ 8    On May 2, 2013, the hearing was held before an HACC hearing officer. The record on appeal contains no transcript or bystander's report regarding the evidence produced at that hearing. The only description of the evidence heard on May 2 comes from the hearing officer's written decision, which was issued May 21, 2013.

¶ 9    According to the hearing officer's decision, HACC presented only written evidence at the hearing, most of which is included in the record. HACC presented a document that purported to be an arrest report completed by an Officer Hart of the Evanston police department. The report, which was dated January 14, 2013, indicated that Lanord had been arrested for "Aggravated Discharge of Firearm/Agg [*sic*] Battery" on January 12, 2013. The description of the offense stated, in its entirety:

> "On 01/12/13 at approx [*sic*] 1900hrs [*sic*], Lanord D. Miles was taken into custody in the 1300 block of Fowler for aggravated battery, and aggravated discharge of weapon. See field supplemental reports for further information."

The report listed Lanord's address as "1315 McDaniel # B."

¶ 10    The referenced "field supplemental reports" are not included in the record. No further documentation from the police department was offered, adding any detail whatsoever regarding this arrest.

¶ 11    HACC also presented a document that purported to be an email chain between Evanston police officer Reggie Napier and Anne Richmond, a "Management Analyst" for HACC. In the first email, dated January 16, 2013, Napier asked Richmond to "check for voucher holders at 1315 Fowler in Evanston." According to Napier, there was "a shooting incident" at that address the previous weekend. In a subsequent email, Napier asked for the names of "voucher holders" at "1315 McDanial [*sic*] in Evanston (one block over)." Napier claimed that "[a]pparently the shots that were fired also involved" that address. Napier wrote, "According to information, drugs and guns are being stored at 1315 McDanial [*sic*]." Napier's final email indicated that "1315 Fowler and 1315 McDaniel (one block apart) have completely destabilized the entire area." Napier said that, "although an arrest was made on LANORD D MILES of 1315 McDaniel for the felony offense of Aggravated Discharge of a Firearm and Aggravated Battery on a public way, it appears that the violence between the two addresses will continue." Napier also indicated that his department's "drug unit" informed him "that active drug sales are occurring at both residences, although the shooting incident didn't appear to be drug related."

¶ 12    HACC also introduced a document purporting to be a background check performed by a company called Aurico Investigations, LLC. The report showed that Lanord had been charged with aggravated discharge of a firearm and aggravated battery on January 14, 2013, and that the case was pending. The report also indicated that Lanord had been charged with

misdemeanor possession of cannabis three times in 2012 and once in 2009, as well as misdemeanor theft and battery in 2010. The disposition of each of the charges from 2009 to 2012 was listed as, "STRICKEN OFF LEAVE."

¶ 13     We are told by the hearing officer's written decision that Tonetta testified on her own behalf at the hearing. We have no transcript of her testimony or, for that matter, of any other part of the proceeding. The following is the entire summary the hearing officer gave of Tonetta's testimony:

> "Ms. Miles stated her entire family should not be responsible for the actions of [Lanord] Miles. Ms. Miles stated that she cannot follow her children 'every step they take.' Ms. Miles stated [Lanord] Miles is not in school but that he was a volunteer at the Peace Center in the Englewood community in Chicago. Ms. Miles stated her son, Mario, is also not in school or working but he recently became a father. Ms. Mile [*sic*] stated her daughter, Monisha, will be enrolling in Cortiva, a trade school, soon."

¶ 14     The hearing officer's written decision also tells us that Tonetta introduced several letters from teachers at her children's schools. These letters stated that Tonetta was reliable and "extremely supportive" of her children's education. They noted that Tonetta's daughter Makyla had formed "lasting relationships" with her teachers and fellow students. However, Makyla had experienced difficulty at school as a result of her being removed from her home. Another praised Tonetta's son Lamarion for being prepared and punctual.

¶ 15     The record also contains an affidavit from an individual named Reggie Jackson which said that, since January 12, 2013, Lanord lived with Jackson at "1811 Wesley Evanston IL 60202." However, the hearing officer did not list this affidavit among the evidence he considered at the hearing.

¶ 16     The hearing officer's findings of fact indicated that "household member, Lanord Miles has engaged in violent and criminal activity, in strict violation of the rules governing the HCV program." The officer found that Lanord's "actions have increased in severity from cannabis possession to felonious discharge of a firearm." The hearing officer construed Tonetta's testimony that she could not continually watch her children as an admission of her "unwillingness to ensure [that] her family abides by the rules and regulations of not only the HCV Program, but the laws of the land." The hearing officer found that HACC had proved its case by a preponderance of the evidence.

¶ 17     On May 29, 2013, Tonetta filed a petition for *certiorari* seeking review of HACC's decision. Tonetta argued that the hearing had violated her right to due process, that the evidence at the hearing was insufficient to find that Lanord had engaged in violent criminal activity, that HACC improperly considered Lanord's arrests occurring prior to Tonetta's participation in the HCV program, and that HACC erroneously believed that the termination of Tonetta's voucher was mandatory rather than discretionary.

¶ 18     On March 27, 2014, the trial court held a hearing on Tonetta's petition for *certiorari*. The trial court noted that HACC did not provide any transcript of the hearing for its consideration. While HACC argued that it was "not required to have a transcript," the trial court responded, "You may not, but that puts you at risk of not having a record on which to base the findings of the hearing officer ***." The court found that the evidence supporting HACC's decision was "very thin." The court characterized HACC's argument as an attempt to "cobble together facts from a series of submissions that, frankly, aren't even clear to the Court what their sources or their reliability is." The court noted that the record before it

contained no foundation for the admission of the arrest report, emails, or background check that HACC had presented. The court concluded that there was "very little reliable information" about whether Lanord had actually committed a crime. The court thus found that HACC's decision was against the manifest weight of the evidence.

¶ 19 The court also found that HACC erred in failing to consider Tonetta's mitigating evidence. The court stated that HUD and HACC regulations did not require HACC to terminate Tonetta's voucher for her son's criminal activity and that HACC did not exercise any discretion in deciding to terminate Tonetta's voucher. Finally, the court rejected Tonetta's due process argument. The court reversed HACC's decision. HACC appeals.

¶ 20                                                II. ANALYSIS
¶ 21                                    A. The Lack of an Adequate Record
¶ 22 At the outset, we must address the deficiency of the record. As the trial court highlighted, HACC has not provided this court with any record of the informal hearing where it terminated Tonetta's voucher. As the appellant, HACC was required to provide a sufficiently complete record on appeal. Ill. S. Ct. R. 323(a), (c) (eff. Dec. 13, 2005); *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In this appeal, we are tasked with reviewing the decision of HACC, not that of the trial court. *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 337 (2009). But HACC, which asks us to reverse the trial court's ruling on the sufficiency of the evidence, has failed to obtain a transcript, bystander's report, or agreed statement of facts relating the evidence presented at the informal hearing. See Ill. S. Ct. R. 323(a), (c), (d) (eff. Dec. 13, 2005) (appellant may provide a bystander's report or agreed statement of fact in lieu of report of proceedings). We will thus construe any doubts which arise from the incompleteness of the record against HACC. *Rogers*, 204 Ill. 2d at 319; *Foutch*, 99 Ill. 2d at 392.

¶ 23 There is an additional reason to hold the lack of a record against HACC, independent of HACC's status as an appellant. An administrative agency has the obligation to make and present a record to permit judicial review of its decision, whether that judicial review takes place under a common-law writ of *certiorari* or pursuant to the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)). See *Porter v. Illinois State Board of Education*, 2014 IL App (1st) 122891, ¶ 25 (*certiorari*); *Mueller v. Board of Fire & Police Commissioners*, 267 Ill. App. 3d 726, 733 (1994) (Administrative Review Law). In the context of the Administrative Review Law, which governs judicial review of most administrative decisions, we have held the lack of a complete record against the agency or board even when the administrative body was the appellee, not the appellant. See *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 35. We did so because it was the duty of the administrative agency under the Administrative Review Law to "present the court of review with the entire record of proceedings, including the evidence it considered." *Id.*; see 735 ILCS 5/3-108(b) (West 2012). The duty on the agency exists "so that the trial court may properly perform its judicial review function." *Mueller*, 267 Ill. App. 3d at 733.

¶ 24 We see no reason for demanding anything less in the context of a *certiorari* petition. "Our review of a writ of *certiorari* is 'essentially the same' as our review of a petition filed under the [Administrative] Review Law." *Porter*, 2014 IL App (1st) 122891, ¶ 25 (quoting *Outcom, Inc.*, 233 Ill. 2d at 337). We treat a *certiorari* appeal "as we would any other appeal

that comes to us on administrative review." *Outcom, Inc.*, 233 Ill. 2d at 337. And this particular matter involves the termination of public benefits and is thus guided by the procedural due process guidelines set out in *Goldberg v. Kelly*, 397 U.S. 254, 266-71 (1970). See *Nalubega v. Cambridge Housing Authority*, No. 12-10124-JGD, 2013 WL 5507038, at *16 (D. Mass. Sept. 30, 2013) ("[C]ourts have uniformly recognized that the *Goldberg* due process requirements apply in the context of subsidized housing benefits." (Internal quotation marks omitted.)). We do not think it is asking too much of an administrative body whose decision is subject to judicial review to provide an adequate record for the court, so that the judiciary can perform its task of ensuring that the administrative body complied with due process and supported its decision with competent evidence.

¶ 25    Ultimately, in reviewing the factual findings of an administrative body, our mandate is the same under either *certiorari* or the Administrative Review Law. When called on to review the administrative body's findings of fact, we must determine whether they are against the manifest weight of the evidence. *Bono v. Chicago Transit Authority*, 379 Ill. App. 3d 134, 143 (2008). But we cannot perform this function when we cannot compare the evidence against the administrative findings of fact in the first place, because the evidence does not exist. This is not even a circumstance where we could remand to the trial court to order the administrative body to furnish a complete record (see *Shallow v. Police Board*, 60 Ill. App. 3d 113, 117 (1978)), because it would be a fruitless exercise–the HACC did not *create* a full record in the first place.

¶ 26    This problem with a lack of a record is manifestly on display in this action. HACC did not transcribe or record the proceedings. Counsel for HACC told the trial court that HACC was not required to do so. Maybe not, but the lack of any transcript deprives us of any first-hand knowledge of Tonetta's testimony. The hearing officer, in the findings of fact, gave a bullet-point summary of her testimony, but we have no way to compare that summary to her actual testimony. We have no idea what Tonetta said or did not say; we must take the hearing officer's word for it.

¶ 27    To give but one example: One of the key issues in this case was whether Lanord was a member of Tonetta's household. Tonetta submitted a notarized affidavit from a Reggie Jackson, who swore that Lanord resided with him, not Tonetta. Did Tonetta say anything at the hearing on this topic? It is hard to believe she did not; she would obviously have personal knowledge as to whether Lanord did or did not live with her. But we do not know what, if anything, she said, much less whether her testimony was credible, because we have no transcript or stipulation of facts. And if she said absolutely nothing on this subject–if she remained utterly silent about that elephant in the room–we would think *that* fact would be relevant, too. But we have no findings from the hearing officer on this point and, more importantly, nothing to which we could compare those findings. A manifest-weight-of-the-evidence inquiry requires two things–the findings of fact and the evidence. We have only been provided one of those two things.

¶ 28    Likewise, we have no context for the documentary evidence HACC submitted during its case. As the trial court recognized, we cannot even determine whether those documents are what HACC claims they are. We have in the record no testimony, or even oral explanation by HACC in its presentation of the evidence, providing any context, much less foundation, for the documents they submitted. We recognize that the rules of evidence are relaxed in an

administrative hearing, but we can only take that leniency so far. We have been given no context for these documents whatsoever.

¶ 29    Absent a transcript of proceedings or some stipulation or agreed statement of facts, our ability to conduct a meaningful judicial review has been thwarted. For the reasons we have given above, we will resolve any doubts arising from the incomplete record against HACC.

¶ 30                    B. The Evidence Consisted Exclusively of Unreliable Hearsay

¶ 31    Even were we to look past the insufficiency of the record, we would still reverse HACC's decision, because HACC relied exclusively on unreliable hearsay evidence for its decision.

¶ 32    In proving by a preponderance of the evidence that a "member of the household," namely Lanord, "engage[d] in violent criminal activity," HACC was required to prove that Lanord was a member of Tonetta's household and that Lanord engaged in violent criminal activity. As we have noted, the three documents on which HACC relied to prove these facts were (1) the arrest report; (2) the email chain between Ms. Richmond and Officer Napier; and (3) a background check performed ostensibly by a private company.

¶ 33    The evidence that Lanord was a member of Tonetta's household came from an email from Officer Napier, where he listed the family members residing with Tonetta and included among them Lanord Miles, and from Officer Hart's arrest report, which listed Lanord's address as 1315 McDaniel in Evanston. That evidence is unquestionably hearsay, statements made outside of the hearing that are offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c) (eff. Dec. 1, 2011); Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); see *Camco, Inc. v. Lowery*, 362 Ill. App. 3d 421, 434 (2005) (arrest report was hearsay).

¶ 34    Evidence of Lanord's arrest for violent criminal offenses came from all three documents listed above, the arrest report, the email chain, and the background check. They were likewise statements outside of the hearing room offered for their truth and, as such, constituted hearsay. Fed. R. Evid. 801(c) (eff. Dec. 1, 2011); Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); *Camco, Inc.*, 362 Ill. App. 3d at 434.

¶ 35    HACC argues that its evidence did not consist entirely of hearsay, pointing to the fact that Tonetta never denied either of these critical facts. But as we have stated above, we have no evidence before us of what she did or did not deny. Nor, for that matter, did the hearing officer *find* that she denied or admitted anything. Thus, we have neither a finding of fact *nor* evidence against which we could compare that finding to support this assertion by HACC. We construe the absence of a complete record against HACC and conclude that the only evidence supporting HACC's termination of Tonetta's voucher was hearsay.[2]

¶ 36    The first problem with HACC's exclusive reliance on hearsay evidence is that it violated HACC's own guidelines, forbidding HACC from doing so.

¶ 37    HUD delegated the administration of the HCV program to local public housing authorities like HACC. 24 C.F.R. § 982.1(a) (2013). Pursuant to HUD regulations, HACC was required to establish an administrative plan for its program (24 C.F.R. § 982.54(a)

---

[2]HACC also tells us that Tonetta did not object to any of this hearsay evidence, thereby forfeiting any objection. But without a transcript, or even a finding of fact that Tonetta did not object, we cannot accept HACC's assertion. We will construe the absence of any supporting evidence against HACC, as we have explained above.

(2013)) and to "administer the program in accordance with [its] administrative plan" (24 C.F.R. § 982.54(c) (2013)). In hearings such as the one we are reviewing, HACC was authorized to consider evidence without regard to the rules of evidence (24 C.F.R. § 982.555(e)(5) (2013)), but HACC's Administrative Plan also provided that hearsay evidence, while "generally admissible," "*cannot be used as the sole basis for the hearing officer's decision.*" (Emphasis added.) HACC Administrative Plan § 16-III.C, at 289.

¶ 38    An administrative agency cannot ignore its own rules once they have been established. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 240-41 (1991); *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board*, 406 Ill. App. 3d 766, 771 (2010); *United Disposal of Bradley, Inc. v. Pollution Control Board*, 363 Ill. App. 3d 243, 251 (2006). HACC's decision, resting solely on hearsay evidence, violated its own Administrative Plan, which in turn violated HUD regulations.

¶ 39    Indeed, even where the local housing authority did not affirmatively require itself, as HACC did here, to base termination decisions on at least some nonhearsay evidence, some courts have imposed that requirement on their own. Some decisions have found that a termination of the voucher based on hearsay evidence alone violated the recipient's right to confront and cross-examine adverse witnesses, which right "is essential when the information supplied by those witnesses is the reason for the loss of benefits." *Edgecomb v. Housing Authority*, 824 F. Supp. 312, 316 (D. Conn. 1993); see also *Stevenson v. Willis*, 579 F. Supp. 2d 913, 919-20 (N.D. Ohio 2008) (while noting that "[h]earsay is admissible" at informal voucher-termination hearings, "it is improper for a hearing officer to rely solely on hearsay evidence" because "the resolution of the dispute depends on disputed issues of fact" and "due process requires an opportunity to confront and cross-examine witnesses"). Other courts have held that, in the proper circumstances, a local housing authority could terminate a housing voucher on exclusively hearsay evidence. See *Costa v. Fall River Housing Authority*, 903 N.E.2d 1098, 1111 (Mass. 2009); *Basco v. Machin*, 514 F.3d 1177, 1182 (11th Cir. 2008). But even those courts emphasized that the exclusively hearsay evidence must "contain[ ] substantial indicia of reliability." *Costa*, 903 N.E.2d at 1110-11 (police report sufficiently reliable where it "offered a detailed factual account based on the personal observations of the detective"); see also *Basco*, 514 F.3d at 1183 (finding police report based on second-hand, unsubstantiated evidence insufficient and reversing termination of section 8 voucher).

¶ 40    Which brings us to the second problem with the hearsay evidence on which HACC exclusively based its decision. Even if we agreed with those courts that have found that a housing voucher could be terminated exclusively based on hearsay evidence, and even if we overlooked the fact that HACC's own administrative plan forbids it from doing so, we would nevertheless find that the hearsay evidence in this case was unreliable. While hearsay is generally admissible in an administrative proceeding, an agency may not rely on hearsay where it is immaterial, irrelevant, or unreliable. *Kurdi v. Du Page County Housing Authority*, 161 Ill. App. 3d 988, 993 (1987). In deciding whether hearsay statements are reliable, a court should consider: (1) the declarant's possible bias; (2) whether statements are signed and sworn, or anonymous, oral, or unsworn; (3) whether the statements are contradicted by other evidence; (4) the declarant's availability and whether the party may subpoena the declarant; (5) the credibility of the declarant or witness testifying to the hearsay; and (6) whether the hearsay is corroborated. *Id.*

¶ 41 The police report authored by Officer Hart revealed nothing about the incident, other than the fact that Lanord had been arrested on January 12, 2013 and that he had been charged with aggravated discharge of a firearm and aggravated battery. There was no information about the offense itself. Instead, the narrative portion of the report referred to supplemental reports, none of which are in the record. Without any information about the underlying offense, it would have been impossible for the hearing officer (and it is impossible for us) to judge the reliability of the assertions in the report.

¶ 42 Second, the emails from Officer Napier lack any indicia of reliability. In fact, most of the information conveyed in the emails is double hearsay, as Napier simply relayed information he had learned from unidentified officers and witnesses. Napier never identified the sources of this information or their basis of knowledge regarding alleged criminal incidents occurring at 1315 McDaniel and 1315 Fowler. Again, while he indicated that Lanord had been arrested, he disclosed no information regarding that offense from which the hearing officer could determine whether Lanord had committed violent criminal activity.

¶ 43 Third, the background check allegedly recounting Lanord's arrest record simply showed that Lanord had been arrested in 2013 and that his case was pending. There was no information about the offense which could permit the hearing officer to determine whether it occurred.

¶ 44 Several other factors weigh against the reliability of these statements. None of the hearsay statements were sworn. Several of the declarants in Napier's emails were anonymous. Tonetta did not have an opportunity to question or subpoena any of the declarants. Without any information about the underlying offenses, it was impossible for the hearing officer to assess the credibility of the statements or any potential bias. Furthermore, none of HACC's other evidence corroborated the hearsay statements. And the hearsay statements only corroborated each other on the limited facts they conveyed: that Lanord had been arrested and charged with aggravated discharge of a firearm and aggravated battery. Thus, HACC's hearsay evidence lacked sufficient indicia of reliability.

¶ 45 Beyond the unreliable hearsay evidence, HACC had no proof that Lanord had engaged in violent criminal activity. We have no record of Tonetta's testimony. None of the other documentary evidence presented by HACC related to the alleged offenses. Thus, absent the unreliable hearsay evidence, HACC had nothing to support its decision to terminate Tonetta's voucher.

¶ 46 C. Hearsay Problems Aside, the Evidence Was Insufficient

¶ 47 Even if we overlooked the hearsay problems and considered the evidence on its face, as did the hearing officer, we would still find that HACC failed to present sufficient evidence to show that Lanord had engaged in violent criminal activity. In order to terminate Tonetta's voucher, HACC was required to show, by a preponderance of the evidence, that a member of her household engaged in "violent criminal activity." See HACC Administrative Plan § 12-I.E., at 218 (HACC will terminate voucher if household member engages in "violent criminal activity"); *Carroll v. Chicago Housing Authority*, 2015 IL App (1st) 133544, ¶ 29 (termination of housing voucher must be supported by preponderance of evidence). HACC's evidence was insufficient to prove that Lanord engaged in "violent criminal activity" or that he was a member of Tonetta's household.

¶ 48 With respect to the finding of "violent criminal activity," we find support for our conclusion in *Landers v. Chicago Housing Authority*, 404 Ill. App. 3d 568, 574 (2010), where we held that a "bare bones" criminal background report on the petitioner's arrests was insufficient reason to deny his application for a housing voucher. The report only showed what offenses the petitioner had been arrested for, the disposition of the charges, and the dates on which the disposition occurred. *Id.* The report provided no context for any of the arrests and disclosed none of the facts underlying the arrests. *Id.* Moreover, each of the charges had been dismissed. *Id.* Thus, the court held that the housing authority could not establish that the petitioner had committed a crime that would justify the denial of his application. *Id.* at 572.

¶ 49 Like the evidence in *Landers*, HACC's evidence in this case was insufficient. At best, it simply showed that Lanord had been arrested, what he had been charged with, and where he was arrested. The evidence disclosed nothing regarding the facts or circumstances of the incident. Lanord did not testify nor did a police officer or any eyewitness. No live testimony shed any light on the incident. While the charges against Lanord had not been dismissed like the charges against the petitioner in *Landers*, that distinction is not meaningful. Like the alleged offenses in *Landers*, the alleged offenses in this case had not been proven; they were pending at the time of the hearing. Even if we assume that there was probable cause that Lanord committed the alleged "violent criminal activity," the existence of probable cause would not satisfy HACC's burden of proving that Lanord committed "violent criminal activity" by a preponderance of the evidence. See *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (probable cause requires "only the probability *** of criminal activity," not a *prima facie* showing of criminal activity (internal quotation marks omitted)); *Howard v. Firmand*, 378 Ill. App. 3d 147, 155 (2007) ("[P]robable cause requires less of an evidentiary showing than a preponderance of the evidence." (Garcia, J., specially concurring)). Thus, HACC failed to present evidence on which the hearing officer could base his finding that Lanord had actually engaged in "violent criminal activity."

¶ 50 Nor did HACC present sufficient evidence that Lanord resided with Tonetta at the time of the incident. While Hart's police report and Napier's email indicated that Lanord lived at 1315 McDaniel, we have previously noted that the record also contains a notarized affidavit from a person named Reggie Jackson who swore that Lanord resided with *him*, not Tonetta, during the time period at issue. Simply comparing the bare facts contained in the email, police report, and affidavit, we cannot say that HACC's evidence outweighed Tonetta's. If anything, the notarized affidavit is probably the most reliable information we have in this record, especially when compared against the unsworn email and police report. And the affidavit, unlike the email and police report, at least disclosed Jackson's basis for knowing where Lanord lived–Jackson claimed that he lived with Lanord. In light of Jackson's affidavit, we cannot conclude that HACC shouldered its burden based on Hart and Napier's bare assertions that Lanord's address was 1315 McDaniel.

¶ 51 Beyond these documents, there is nothing to support a finding that Lanord lived with Tonetta. As we noted earlier, for all we know, Tonetta may have discussed this critical fact in her testimony. Indeed, it is hard to imagine that she and the hearing officer would not have discussed whether Lanord did or did not reside at her address. But, absent a transcript, we have no idea. We are unable to find reliable support for this critical finding of fact–that Lanord was a member of Tonetta's household–in the record. As explained above, we

- 10 -

construe these gaps in the record against HACC. *Rogers*, 204 Ill. 2d at 319; *Foutch*, 99 Ill. 2d at 392. Thus, we also find that HACC presented insufficient evidence to prove that Lanord Miles was a member of Tonetta's household.

¶ 52                                  III. CONCLUSION

¶ 53        For all of these reasons, we find that HACC's finding that a member of Tonetta's household engaged in violent criminal behavior was against the manifest weight of the evidence. We agree with the trial court that HACC's decision must be reversed. We affirm the judgment of the trial court.

¶ 54        Affirmed.